221 P.3d 928 (2009)
STATE of Washington, Respondent,
v.
Charles HARTZELL, Appellant.
State of Washington, Respondent,
v.
Jeremy Tieskotter, Appellant.
No. 63816-5-I.
Court of Appeals of Washington, Division 1.
November 16, 2009.
*933 Thomas Edward Doyle, Attorney at Law, Hansville, WA, for Charles Hartzell.
Patricia Anne Pethick, Attorney at Law, Tacoma, WA, for Jeremy Tieskotter.
Carol L. La Verne, Thurston County Prosecutor's Office, Olympia, WA, for Respondent.
BECKER, J.
¶ 1 Charles Hartzell and Jeremy Tieskotter were convicted of armed assault and unlawful possession of a firearm for shooting into an apartment occupied by a woman and her daughter. Investigators were able to link Hartzell and Tieskotter to the crime by establishing that the guns they possessed in two separate incidents were the same guns used to shoot into the apartment. Upon review of their assignments of error, we conclude that the evidence of the two separate incidents was properly admitted under ER 404(b); the trial court's limiting instruction was not a comment on the evidence; and appellant Hartzell opened the door to hearsay when he himself elicited an incomplete and misleading hearsay version of events from one of the detectives. And although the special verdict returned by the jury found only that the appellants were armed with deadly weapons, the court's imposition of a firearm sentence enhancement is not a reversible error because the State charged a firearm enhancement and there was no evidence *934 of any weapons other than the guns used in the shooting. We affirm.
¶ 2 According to testimony at trial, Michael Vernam was awakened by gunshots outside his home on Trailblazer Road in Thurston County early in the morning of April 7, 2007. He looked outside and saw someone shooting from what he thought was the sunroof of a red car. The car moved as shots were fired, so Vernam concluded that more than one person was in the car.
¶ 3 The gunshots also woke Kimberly Hoage, but she thought someone was banging on the wall outside her apartment. Later in the day, however, Hoage discovered bullet holes in the headboard of the bed where she and her daughter had been sleeping. Sheriff's deputies found a bullet and bullet fragments in the apartment and shell casings or cartridges from .9 mm and .357 mm caliber bullets outside.
¶ 4 Four days after the shooting at Hoage's apartment in Thurston County, police officers in Pierce County interviewed Jeremy Tieskotter in response to a report of him firing a .9 mm semi-automatic handgun in Lakewood. Tieskotter admitted firing the gun. Ballistics analysis showed that the bullets fired into Hoage's apartment had come from the same .9 mm weapon.
¶ 5 The next month at about 10 o'clock in the evening Kitsap County Sheriff's Deputy Daniel Twomey was dispatched to a house in a rural area of Kitsap County in response to a call of a man with a gun. The suspect had been described as a "skinhead." While the officer was waiting outside the house for backup to arrive, a RAV4 compact SUV pulled into the driveway and a man later identified as Hartzell got out. Hartzell gave a false name and claimed to be looking for his girlfriend, Sarah Dodge, who he said had been given a pill "by a guy named Randy," was acting "crazy," and had gotten out of the car somewhere in the area.[1] When backup arrived, Deputy Twomey went inside where he found Sarah Dodge. After interviewing her, he took Hartzell into custody, and then discovered there was a bullet hole through the passenger door of the RAV4. Inside the vehicle, Detective Twomey found a .357 SIG cartridge on the front passenger-side floor, several boxes of .357 SIG ammunition in the rear, and a .357 SIG bullet in the seam of Hartzell's jacket.[2]
¶ 6 A K-9 officer was called to look for the gun that shot the bullet through the passenger door of the RAV4. The dog jumped up on the door, sniffed, then went south on the shoulder of Sidney Road. Less than 100 yards from where the RAV4 was parked, the dog found a .357 semi-automatic handgun, several rounds short of being fully loaded. A ballistics expert later determined that this was the same gun that had fired .357 bullets into Hoage's apartment in Thurston County.
¶ 7 Officers learned that Tieskotter and Hartzell were good friends. They also found out that Hartzell and his girlfriend, Sarah Dodge, had been staying with Hoage days before the shooting at Hoage's apartment. Hartzell and Dodge were forging checks, and Hoage had threatened to call the police if they did not leave. After he and Dodge left, Hartzell called Hoage to demand that she return his laptop. Hoage ignored the message because she had seen Hartzell leave with the laptop. But after the shooting she became fearful because she received a threatening text message from Hartzell that led her to believe he was the one who shot at her apartment.
¶ 8 Hartzell and Tieskotter were each charged in Thurston County Superior Court with assault in the second degree while armed with a deadly weapon (a firearm) (Count 1), drive-by shooting (Count 2), and unlawful possession of a firearm in the first degree (Count 3). The two cases were joined for trial. Both defendants were convicted on Counts 1 and 3. The jury returned special verdict forms finding that each defendant was armed with a deadly weapon during the assaults. The court imposed 36-month firearm sentence enhancements. The appeals of Hartzell and Tieskotter have been consolidated.

*935 SEARCH ISSUE
¶ 9 Hartzell argues that the trial court erred when it admitted evidence of the gun recovered in Kitsap County. He contends the dog sniffing through the open window of the RAV4 was a search requiring a warrant under article I, § 7 of the Washington Constitution.
¶ 10 Const. art. 1, § 7 protects a person's home and his private affairs from warrantless searches: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Article I, § 7 is not implicated if no search occurs. State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994). To determine if there was a search, the court asks whether the State unreasonably intruded into a person's "private affairs." Young, 123 Wash.2d at 181, 867 P.2d 593. If it did, a warrant was required unless the circumstances fell into one of the recognized exceptions to the warrant requirement. Young, 123 Wash.2d at 181, 867 P.2d 593. None of those exceptions is present in this case.
¶ 11 The inquiry whether the State unreasonably intruded into a person's private affairs focuses on the privacy interests that "citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984). In general, a search does not occur if a law enforcement officer is able to detect something using one or more of his senses from a non-intrusive vantage point. State v. Seagull, 95 Wash.2d 898, 901, 632 P.2d 44 (1981). Such observation does not violate Washington's constitution because something voluntarily exposed to the general public and observable without an enhancement device from a lawful vantage point is not considered part of a person's private affairs. Young, 123 Wash.2d at 182, 867 P.2d 593. An observation may constitute a search, however, if the officer substantially and unreasonably departs from a lawful vantage point or uses a particularly intrusive method of viewing. Young, 123 Wash.2d at 182-83, 867 P.2d 593. What is reasonable is determined from the facts and circumstances of each case. Seagull, 95 Wash.2d at 903, 632 P.2d 44.
¶ 12 Whether or not a canine sniff is a search depends on the circumstances of the sniff itself. State v. Boyce, 44 Wash.App. 724, 729, 723 P.2d 28 (1986). In Boyce, this court held that as long as the canine "sniffs the object from an area where the defendant does not have a reasonable expectation of privacy, and the canine sniff itself is minimally intrusive, then no search has occurred." Boyce, 44 Wash.App. at 730, 723 P.2d 28.
¶ 13 The trial court correctly concluded that Hartzell did not have a reasonable expectation of privacy in the air coming from the open window of the vehicle. Hartzell was not in the SUV when the dog sniffed from a lawful vantage point outside the vehicle. The sniff was only minimally intrusive. The trial court did not err when it denied Hartzell's motion to suppress the evidence.

ER 404(b)
¶ 14 Hartzell and Tieskotter contend the evidence connecting Hartzell to the gun found in Kitsap County and Tieskotter to the gun fired in Pierce County was improperly admitted because it was used to show they had a propensity to commit gun crimes.
¶ 15 Washington's ER 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
This court reviews decisions to admit evidence under ER 404(b) for abuse of discretion. State v. Lough, 125 Wash.2d 847, 863, 889 P.2d 487 (1995). A court abuses its discretion if it is exercised on untenable grounds or for untenable reasons. State v. Thang, 145 Wash.2d 630, 642, 41 P.3d 1159 (2002).
¶ 16 The test for admitting evidence under ER 404(b) is well-established. To admit evidence of other wrongs, the trial court must (1) find by a preponderance of the *936 evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. Lough, 125 Wash.2d at 853, 889 P.2d 487.
¶ 17 As to the first prong, Hartzell argues that the evidence of the Kitsap County incident was insufficient to establish by a preponderance that he had possessed the loaded .357 handgun found by the dog. But the gun was found less than 100 yards from where Hartzell parked the RAV4 when he pulled up, purportedly looking for Sarah Dodge. The dog tracked the weapon after sniffing around the bullet hole in the vehicle Hartzell had been driving. A bullet found in Hartzell's clothing after he was arrested was the same type as the cartridge found on the floor of the RAV4. More of the same ammunition and documents connected to Hartzell were in the vehicle. This proof sufficiently linked Hartzell to the gun and satisfied the first prong of the ER 404(b) test.
¶ 18 Tieskotter similarly argues that the Pierce County evidence was insufficient to meet the first prong because it did not establish that he was one of the people who shot at Hoage's apartment. But whether he was one of the people who shot at Hoage's apartment was the ultimate question for the jury. To meet the test for ER 404(b) evidence, the State merely needed to show by a preponderance that the Pierce County incident occurred. When Tieskotter was arrested in Pierce County he admitted he shot the gun, and there were two eyewitnesses. This was sufficient proof of the Pierce County incident for the court to admit the Pierce County evidence.
¶ 19 The State offered the evidence of the guns associated with the defendants in Kitsap and Pierce counties because it was circumstantial evidence that Hartzell and Tieskotter were the individuals who fired the same guns at Hoage's apartment. The appellants argue that their conduct in the other incidents was not similar enough to what happened in Thurston County to be admissible to prove identity. They rely upon cases in which evidence of other bad acts is offered to establish identity by showing a unique "modus operandi." See Thang, 145 Wash.2d at 643, 41 P.3d 1159 (modus operandi evidence is relevant only if the method used to commit both crimes is so unique that proof that the defendant committed one crime makes it highly probable that the defendant committed the other crime). But the State was not trying to prove that the shooting into Hoage's apartment was a "signature crime" committed by certain individuals with a unique style. Rather, the evidence was offered merely to show that the weapons used to fire bullets into Hoage's apartment were found shortly thereafter in the possession of Hartzell and Tieskotter, thus tending to make it more probable that they were the individuals who did the shooting at Hoage's apartment. The evidence was relevant for this purpose, and it did not have to meet the test for modus operandi evidence.
¶ 20 Contrary to Hartzell's contention, the court did weigh the probative value of the evidence against its prejudicial effect. The court stated on the record that the prejudice from the Kitsap County incident was minimized by the limited amount of information the State intended to introduce about that incident. This satisfies the fourth element of the test.
¶ 21 In summary, the record demonstrates that the other two gun incidents were not admitted to show that the appellants committed the shooting in Thurston County in conformity with their general propensity to use guns. The evidence was admitted because it was circumstantial evidence connecting the appellants to the particular guns that were used in the Kitsap and Pierce County incidents. Connecting them to the guns was relevant because of the expert testimony that those same guns were used to fire at Hoage's apartment. The probative value of the evidence outweighed its prejudicial effect. The trial court did not err when it admitted evidence of the shootings in Pierce and Kitsap County under ER 404(b). Because the evidence was properly admitted, we reject Tieskotter's further claim that *937 counsel was ineffective for failing to prevent the court from admitting it.

OPEN DOOR
¶ 22 When the court was considering whether to admit the evidence of the incident in Kitsap County, Hartzell objected because the prosecutor did not intend to elicit all the details that were included in the police report. Hartzell believed a more detailed account would show that someone else"Randy"was responsible for the shooting in Kitsap County. The court warned Hartzell, who was representing himself, that if he were to insist on eliciting the evidence that favored his version of the event, less favorable evidence might also be admitted: "I caution you, if you do that, then the State may bemay have the right to present all the information of which they are aware regarding that incident, some of which could be prejudicial to you."[3]
¶ 23 During direct examination of Detective Twomey, the prosecutor complied with an order in limine and limited the officer's testimony to what he saw and heard outside the house after the RAV4 drove up. On cross-examination, Hartzell elicited testimony from Detective Twomey that Sarah Dodge was crying and upset when he spoke with her inside the house. She told the officer that she had been inside the vehicle with Hartzell and "Randy" when the handgun was fired. She said Hartzell was driving and Randy was in the passenger seat. She initially told the officer that Randy had the gun, but she was uncertain whether Hartzell or Randy fired. Hartzell continued in this vein, eliciting further testimony from the officer about what Sarah Dodge said:
Q: (Hartzell): What did Sarah say that Randy told her?
A: (Detective Twomey): Randy asked her if she had heard that [the shot], and she replied that she did, and he told her to, "Shut the fuck up." That was her quote. And she said that you were agreeing with Randy as he was saying those things.
Q: When she said I was agreeing, did she say in what way, verbally, physically?
A: The characterization that she was presenting was that the two of you were acting as equal parts of the threats that were being made.[[4]]
¶ 24 Before beginning redirect examination, the prosecutor sought permission to elicit testimony that Detective Twomey was dispatched to the scene because of a threat to kill, and to elicit a more extensive account of what Sarah Dodge told him inside the house. The trial court agreed that in fairness to the State, the prosecutor should be allowed to elicit information within the scope of the cross-examination Hartzell conducted. Over Hartzell's hearsay objection, the court ruled that this would include everything that Dodge told the deputy.[5]
¶ 25 On redirect, Detective Twomey testified that when he talked to Dodge, she told him that Randy had threatened that Hartzell was going to kill her with his bare hands or shoot her, and Hartzell was agreeing with everything Randy said. Dodge also told Detective Twomey that before she jumped out of the car, Hartzell said to her, "I hope you die, so I don't have to kill you."[6]
¶ 26 Hartzell argues that allowing Detective Twomey's rebuttal testimony denied him his constitutional right to confront Dodge and prejudiced him by letting the jury hear about his threats to kill Sarah Dodge. He suggests that the "open door" doctrine must give way to constitutional concerns. We disagree. A defendant may open the door to evidence that would otherwise be inadmissible, even if constitutionally protected, if the rebuttal evidence is relevant. 5 Karl B. Tegland, Washington Practice: Evidence Law, § 103.14, at 66-67 (5th ed.2007); see State v. Kendrick, 47 Wash.App. 620, 629-31, 736 P.2d 1079 (1987) (testimony regarding defendant's post-arrest silence was admissible to rebut defendant's evidence that he was cooperative following arrest); see also Harris v. New York, 401 U.S. 222, 225, 91 *938 S.Ct. 643, 28 L.Ed.2d 1 (1971) (criminal defendant is privileged to testify in his defense, or refuse to do so, but privilege cannot be construed to include the right to commit perjury).
¶ 27 The decision whether to admit or exclude evidence or limit the scope of redirect examination is within the trial court's discretion. State v. Gallagher, 112 Wash.App. 601, 609, 51 P.3d 100 (2002). Hartzell's cross-examination of Detective Twomey was aimed at creating the impression that Dodge told him it was Randy, not Hartzell, who had fired the gun during the incident in Kitsap County. By conducting cross-examination in this way, Hartzell opened the door to letting the detective give a fuller account of what Dodge said, including her statements showing that it was Hartzell, not Randy, who was threatening to shoot her. The trial court did not abuse its discretion by admitting this testimony.

LIMITING INSTRUCTION
¶ 28 It was agreed that the court should instruct the jury that the gun evidence from the other counties was admitted for a limited purpose, but in a manner that would not be a comment on the evidence.
¶ 29 The two defendants had different concerns about how to word the instruction. Tieskotter wanted an instruction especially for his case, and he proposed the following:
Evidence from other jurisdictions has been introduced against Mr. Tieskotter that you may or may not consider for the limited purpose of establishing an association of the defendant to the crimes charged. You must not consider this evidence for any other purpose.[[7]]
Tieskotter also proposed another instruction that was not specific to him:
Evidence has been introduced from another county in this case on the subject of identity for the limited purpose of showing an association between a defendant and a shell casing or expended shell. You must not consider this evidence for any other purpose.[[8]]
¶ 30 Hartzell offered three variations of a limiting instruction, but ultimately proposed the following:
Evidence of unrelated alleged prior bad acts or crimes has been introduced from another county for the limited purpose of showing an alleged association to particular defendants to particular evidence. It may not be considered for any other purpose.[[9]]
The State proposed an instruction that referred to the evidence from other counties as circumstantial evidence of an association between the defendants and the charged crime.
¶ 31 The court preferred to give a single limiting instruction applicable to both defendants to avoid confusion: "If it's impossible to do that, I would consider separate instructions for both of them, but I see that as somewhat problematic."[10] The court proposed the following, which ultimately was given as Instruction 27:
Evidence from other jurisdictions has been admitted that you may consider as establishing an association of the defendants to the crimes charged. You must not consider this evidence for any other purpose.
The appellants contend that Instruction 27 was a comment on the evidence.
¶ 32 Under Article IV, § 16 of our constitution, a judge is prohibited from conveying to the jury his personal opinion about the merits of the case or from instructing the jury that a fact at issue has been established. State v. Levy, 156 Wash.2d 709, 721, 132 P.3d 1076 (2006). Any remark "that has the potential effect of suggesting that the jury need not consider an element of an offense" could qualify as a judicial comment. Levy, 156 Wash.2d at 721, 132 P.3d 1076. Impermissible judicial comments on the evidence are presumed to be prejudicial. Reversal is required unless the State shows that the defendant was not prejudiced or the record *939 affirmatively shows that no prejudice could have resulted. Levy, 156 Wash.2d at 723, 132 P.3d 1076.
¶ 33 At the same time, a trial court must give a limiting instruction where evidence is admitted for one purpose but not for another and the party against whom the evidence is admitted asks for a limiting instruction. ER 105; Gallagher, 112 Wash. App. at 611, 51 P.3d 100. The trial court is not obliged to give the instruction in the exact language proposed by the defendant. The court has broad discretion to fashion its own limitation on the use of the evidence. Gallagher, 112 Wash.App. at 611, 51 P.3d 100.
¶ 34 Tieskotter contends that Instruction 27 told the jury that the two defendants were involved in each other's crimes in Kitsap County and Pierce County. This is a strained reading. The evidence admitted was clear that Tieskotter was involved only in the Pierce County incident and was not part of the incident in Kitsap County. The trial court properly denied Tieskotter's motion for a new trial raising this argument.
¶ 35 Hartzell argues that by referring to evidence "from other jurisdictions," Instruction 27 encouraged the jury to take all of the unfavorable evidence about him from the Kitsap County incidentthe description of him as a "skinhead," the evidence that he lied about his name and birthdate, the threats he made against his girlfriendand reason that a person who did all of those things likely committed the Thurston County shooting. But as the State points out, a limiting instruction "does not limit the evidence to be considered, but rather the purpose to which it can be put. The instruction here does just that; the jury could consider it only to determine whether it connected the defendants to the Thurston County crimes."[11]
¶ 36 Hartzell raises a closer issue when he argues that the instruction was equivalent to a directed verdict with its language that the jury "may consider" the evidence from the other counties "as establishing an association of the defendants to the crimes charged." Below, Hartzell asked the court to modify the instruction to say that the jury "may or may not" consider the evidence as establishing an association. The court rejected that request, explaining that "may" was permissive.[[12]]
¶ 37 A court may not instruct the jury that "matters of fact have been established as a matter of law." State v. Becker, 132 Wash.2d 54, 64, 935 P.2d 1321 (1997). In Becker, the trial court imposed enhanced sentences on the defendants because they had delivered cocaine within 1,000 feet of the Youth Education Program, a general equivalency degree program administered by the Seattle School District. The statute authorizing the enhancement required that the delivery occur within 1,000 feet of "school grounds." The State claimed that the Youth Education Program was a school, but whether it was or not was the major issue at trial. A special verdict form asked the jury whether the defendants were "within 1000 feet of the perimeter of school grounds, to-wit: Youth Employment Education Program School at the time of the commission of the crime?" (Emphasis added.) Becker, 132 Wash.2d at 64, 935 P.2d 1321. Our Supreme Court reversed the sentence enhancements, concluding that by identifying the program as a school in the special verdict form, the trial court "literally instructed the jury that YEP was a school." Becker, 132 Wash.2d at 65, 935 P.2d 1321. See also State v. Jackman, 156 Wash.2d 736, 745, 132 P.3d 136 (2006) (court commented on the evidence by putting victims' dates of birth in the to-convict instructions, where their minority was an element the State had to prove).
¶ 38 Hartzell maintains that Instruction 27 similarly instructed the jury that the defendants were associated with the crimes charged in Thurston County as a matter of law, instead of leaving it to the jury to decide that essential question as a factual matter. The State offers what it argues is a more reasonable reading of the instruction: "You may consider this evidence to decide whether it establishes a connection between the defendants *940 and the charged crimes."[13] In hindsight, the language the State now offers might have been preferable. Nevertheless, the language the trial court used was not comparable to the special verdict form in Becker or the birthdates provided by the court in Jackman. It did not explicitly direct a verdict or remove a factual issue from the jury's consideration.
¶ 39 As the trial court correctly stated, "may" is generally viewed as a term that sufficiently communicates to a jury that it is permitted but not required to find a particular fact. Our Supreme Court faced a similar question when asked to decide whether the inference of intent instruction used in burglary cases created a mandatory or permissive inference. State v. Brunson, 128 Wash.2d 98, 905 P.2d 346 (1995). The instruction in that case stated: "A person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein. This inference is not binding upon you and it is for you to determine what weight, if any, such inference is to be given." Brunson, 128 Wash.2d at 101, 905 P.2d 346. The court concluded the language of the instruction was "clearly discretionary" and nothing in it suggested that the jury "must" infer criminal intent if it found unlawful entry. Brunson, 128 Wash.2d at 106, 905 P.2d 346. Similarly here, we conclude the use of the word "may" was permissive and nothing in the language of Instruction 27 suggested that the jury "must" find that the evidence from other jurisdictions associated the defendants to the Thurston County shooting.
¶ 40 The State's argument did not mislead the jury on this point. The prosecutor argued that the connection of the guns fired in Pierce and Kitsap counties to the guns fired at Hoage's apartment in Thurston County was circumstantial evidence that Hartzell and Tieskotter committed the Thurston County crimes:
Now, ladies and gentlemen, [Hartzell] does argue that, well, there is nobody that puts me in Thurston County on April 7th, and Mr. Woodrow argues for Mr. Tieskotter that no one puts him in Thurston County on April 7th. I know that, and you know that. We have no direct evidence of that, but what are we to do?
We must rely on circumstantial evidence, that law that allows you to use your common sense and draw reasonable inferences....
...
And when you have a gun used by Mr. Tieskotter and independently a gun associated with Mr. Hartzell bound together at a residence on April 7th because they are the weapons used, that is compelling evidence of not only accomplice liability, but that these people were doing the shooting.[[14]]
¶ 41 Instruction 27 did not prevent the appellants from arguing their theories of the case. Tieskotter's lawyer began his argument stating that "Mr. Tieskotter disputes ... that he was associated with" the Thurston County crime.[[15]] Much of Tieskotter's closing argument was an attempt to refute the evidence that allegedly connected him to the shooting in Thurston County. He argued that he did not have a motive to shoot at Hoage's apartment and, although Hartzell may have had a motive, he did not assist Hartzell because the friendship they had dissolved before the shooting. Similarly, Hartzell argued that he was not connected to the gun in Kitsap County and, therefore, the gun evidence did not connect him to the Thurston County shooting.
¶ 42 Although the instruction perhaps could have been more artfully worded, we conclude the trial court successfully maintained the necessary balance between the obligation to give a satisfactory limiting instruction and the obligation to refrain from commenting on the evidence.

STATE'S CLOSING ARGUMENT
¶ 43 Hartzell contends that the prosecutor's closing argument denied him a fair trial because it shifted the burden of proof *941 and implied facts not in evidence. Hartzell particularly complains about arguments regarding his failure to call certain witnesses.
¶ 44 A defendant who alleges prosecutorial misconduct must establish that the prosecutor's conduct was both improper and prejudicial. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003). Prejudice is established only if there is a substantial likelihood that the misconduct affected the jury's verdict. Dhaliwal, 150 Wash.2d at 578, 79 P.3d 432. A defendant who does not make a timely objection waives review unless the prosecutorial misconduct "is so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct." State v. Belgarde, 110 Wash.2d 504, 507, 755 P.2d 174 (1988).
¶ 45 Hartzell mentioned in his closing argument that some people who may have had relevant information about the case, including Dodge and Juan Copin, were not called to testify at trial. According to Hoage's testimony, Copin was someone she initially suspected of being one of the shooters. Hartzell suggested that the State did not call the missing witnesses to testify because their testimony would have contradicted the State's evidence:
I will tell you where they are. [The prosecutor] struck them from the list. They were all on his list, and he struck them. He struck them, because he is afraid they were going to tell you the truth.
But this is not going to be case about where somebody comes up there and tell you the truth. The truth is something you are going to have to infer, infer yourself, and it's not what has been said that speaks the loudest; it's what you haven't heard.[[16]]
¶ 46 In response, the prosecutor argued that Hartzell could have called Sarah Dodge as a witness:
Ms. Dodge is available to the defense, Mr. Hartzell. Sarah Dodge was his girlfriend. Sarah Dodge could have been called by Mr. Hartzell. I have been attacked for not calling Sarah Dodge, but I can assure you, ladies and gentlemen, that the defense could have called her.
As a matter of fact, it's, as you know, ladies and gentlemen, a defendant naturally and, thank God, has many rights under our system. They don't have to testify. They are presumed innocent until proven guilty, and during a trial such as this, they don't have to do anything. They don't have to put on a case. They don't have to put on any witnesses, but they can.
Mr. Hartzell could have called these people he has named like Sarah Dodge and this Juan Copin. He did not, and you may consider the evidence and the lack of evidence, and you might consider why Mr. Hartzell did not offer Ms. Dodge or for that matter Juan Copin.[[17]]
Hartzell did not object to these comments.
¶ 47 Even had there been a timely objection, we would not find misconduct. Although an attorney may not make prejudicial statements in closing argument that are not supported by the record, counsel is given latitude to argue the facts and reasonable inferences from the facts. Dhaliwal, 150 Wash.2d at 577, 79 P.3d 432. A prosecutor may encourage the jury to draw an unfavorable inference from a defendant's failure to produce evidence that is properly part of the case and is within the control of the defendant in whose interest it would be to produce it, unless the prosecutor's comments infringe on the defendant's constitutional rights. State v. Blair, 117 Wash.2d 479, 485-91, 816 P.2d 718 (1991).
¶ 48 Hartzell argues that the prosecutor's comments implied that he was obligated to present evidence and infringed upon his right to be presumed innocent. The arguments, however, were a pertinent reply to Hartzell's own comments and did not shift the burden to present evidence to Hartzell. On the contrary, the prosecutor specifically emphasized that Hartzell had no duty to present evidence.
¶ 49 Hartzell did not object to these arguments; the arguments were a pertinent reply to Hartzell's closing statement; and they *942 were not so flagrant and ill-intentioned that a curative instruction would have been useless.
¶ 50 Hartzell also argues that the prosecutor committed misconduct when arguing that Hartzell's calling his mother to testify and give him an alibi was an act of desperation. The prosecutor commented that of course a mother would try to help her son when told that a particular date and time was important. Hartzell's objection was overruled. He now contends the comment implied that Hartzell told his mother what to say. The comment, however, did not imply facts not in evidence as it would not have been understood as quoting from evidence not admitted. The prosecutor was simply dramatizing an argument based upon common experience, in response to Hartzell's argument in which he vouched for his mother's veracity. See State v. Barrow, 60 Wash. App. 869, 873-74, 809 P.2d 209 (1991).
¶ 51 We conclude prosecutorial misconduct did not deprive Hartzell of a fair trial.

FIREARM ENHANCEMENT
¶ 52 Hartzell and Tieskotter contend that the trial court erred by imposing a 36-month firearm sentence enhancement when the special verdict forms asked only whether the defendants were armed with a deadly weapon. They contend the enhancement should have been only 12 months for being armed with a deadly weapon. The State responds that the use of the term "deadly weapon" in the special verdict form did not prevent the court from imposing the longer firearm enhancement because the State included the firearm charge in the information; the jury was instructed that for purposes of the special verdict, a firearm is included in the definition of "deadly weapon"; and the two guns from which bullets were fired at Hoage's house were the only weapons mentioned throughout the trial.
¶ 53 Analysis of this issue begins with a defendant's Sixth Amendment right to a trial by jury. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). For Apprendi purposes, the "statutory maximum" is the maximum sentence a judge may impose based solely on facts admitted by the defendant or reflected in the jury's verdict. Blakely v. Washington, 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Washington's Supreme Court held that it is a violation of Blakely for a judge to impose a firearm sentence enhancement based upon a jury's special verdict that the defendant was armed with a deadly weapon. State v. Recuenco, 154 Wash.2d 156, 163, 110 P.3d 188 (2005) (Recuenco I), rev'd on other grounds, 548 U.S. 212, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006). In Recuenco I, our Supreme Court also held that an error involving the right to jury findings could never be harmless. Recuenco I, 154 Wash.2d at 164, 110 P.3d 188.
¶ 54 The United States Supreme Court granted review of Recuenco I and concluded that while Blakely errors are constitutional, harmless error analysis may nevertheless be applied to them because Blakely errors are not "structural." Washington v. Recuenco, 548 U.S. 212, 218-222, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (Recuenco II). In federal parlance that means they are not the type of errors that necessarily render a criminal trial "fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Neder v. United States, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In light of its decision, the Court remanded the case back to our Supreme Court for further proceedings, leaving open the question whether adequate and independent state-law grounds supported our court's holding that a Blakely error could never be harmless. See Recuenco II, 548 U.S. at 222, 126 S.Ct. 2546.
¶ 55 On remand, our Supreme Court revised its original analysis and determined that the error committed in the trial court was not a Blakely error. The problem was not that the judge had enhanced the sentence by usurping the jury's role as factfinder. The problem was that the enhancement imposed for being armed with a firearm was not authorized by the charges. It was not requested by the State until sentencing. *943 State v. Recuenco (Recuenco III), 163 Wash.2d 428, 441-42, 180 P.3d 1276 (2008).
¶ 56 The State must include in the charging documents the essential elements of the alleged crime to give the defendant notice of the crime charged and to enable him to prepare a defense. Recuenco III, 163 Wash.2d at 434, 180 P.3d 1276. Sentencing enhancements must be included in the information. Recuenco III, 163 Wash.2d at 434, 180 P.3d 1276. In Recuenco's case, the information charged him with second degree assault "with a deadly weapon, to-wit: a handgun". It did not mention the term "firearm." And the trial court rejected the defendant's request to define "firearm" for the jury because the prosecutor stated that no element of a firearm was included in the charged crime or the enhancement. Recuenco III, 163 Wash.2d at 431-32, 180 P.3d 1276. The jury returned a special verdict finding that Recuenco was armed with a deadly weapon. Yet at sentencing, the court imposed a firearm enhancement.
¶ 57 "The error in this case occurred when the trial judge imposed a sentence enhancement for something the State did not ask for and the jury did not find." Recuenco III, 163 Wash.2d at 442, 180 P.3d 1276. The Supreme Court concluded that "it can never be harmless to sentence someone for a crime not charged, not sought at trial, and not found by a jury." Recuenco III, 163 Wash.2d at 442, 180 P.3d 1276. Therefore, the Court vacated the firearm enhancement and remanded the case for resentencing.
¶ 58 The Recuenco III analysis has been applied to grant a personal restraint petitioner's request for relief from a firearm enhancement. In re Pers. Restraint of Delgado, 149 Wash.App. 223, 204 P.3d 936 (2009). There, the imposition of firearm enhancements was held to be error, even though based on special verdicts that each defendant was armed with a firearm, because the language in the special verdict forms did not match the instruction about how to answer the special verdicts. The jury was instructed that to return the special verdicts, it must find the defendants were armed with a "deadly weapon". The jury received a definition of "deadly weapon" but no definition of firearm. Delgado, 149 Wash.App. at 237, 204 P.3d 936.
¶ 59 The court remarked that if a harmless error analysis were available, "we would almost certainly deny relief" because it was undisputed that the deadly weapon in question was a firearm. Delgado, 149 Wash.App. at 237, 204 P.3d 936. But the court reasoned that under Recuenco III, the error was "not subject to harmless error analysis regarding instructional error" because the State did not charge the defendants with firearm enhancements and therefore the jury instructions contained no error. Delgado, 149 Wash.App. at 237, 204 P.3d 936.
¶ 60 Indisputably, the inquiry required by Recuenco III begins with the charging document. In that case, the defendant was not informed until sentencing that the State would be seeking a firearm enhancement. Thus, he did not have notice that he was defending against a firearm allegation. Recuenco III, 163 Wash.2d at 441, 180 P.3d 1276. The information, the instructions, and the statements of the prosecutor all consistently advised him that at most, his sentence would be enhanced for use of a deadly weapon.
¶ 61 In the present case, however, the information did include a firearm allegation. The information charging Tieskotter is illustrative:
COUNT IASSAULT IN THE SECOND DEGREE WHILE ARMED WITH A DEADLY WEAPON, RCW 9A.36.021(1)(c), RCW 9.94A.535/602 CLASS B FELONY:
In that the defendant, JEREMY RYAN TIESKOTTER, in the State of Washington, on or about April 7, 2007, did intentionally assault another person with a deadly weapon. It is further alleged that this crime was committed while the defendant or an accomplice was armed with a deadly weapon, a firearm.

(Emphasis added).
¶ 62 The specific reference to "a firearm" is a significant distinction from Recuenco III that is also found in Delgado, where the information similarly alleged that the defendants *944 committed their crimes while "armed with a deadly weapon, to-wit: a firearm". Delgado, 149 Wash.App. at 229, 204 P.3d 936. As in the present case, the Delgado information cited RCW 9.94A.602. This statute authorizes the use of a special verdict asking the jury to find whether or not the accused was "armed with a deadly weapon at the time of the commission of the crime" where there has been a special allegation and evidence that such was the case. And the information also cited former RCW 9.94A.510. This statute set forth the sentencing grid for standard sentences, and it also had detailed provisions for adjusting the length of a standard range sentence in certain circumstances. The same provisions are now found in RCW 9.94A.533. Adding time for being armed with a firearm is addressed in subsection (3) while adding time for being armed with a deadly weapon is addressed in subsection (4).
¶ 63 The Delgado court did not regard the information as sufficient to charge a firearm enhancement because it did not specifically cite the subsection addressing how much time to add for being armed with a firearm, former RCW 9.94A.510(3). Delgado, 149 Wash.App. at 227, 229, 204 P.3d 936. Hartzell makes a similar argument in his statement of additional grounds, where he contends that the information was deficient because it did not cite RCW 9.94A.533 or any of its subsections. We do not find this reasoning to be compelled by Recuenco III. To notify each defendant of the State's intention to seek a firearm enhancement, it was enough to cite the deadly weapon special verdict statute, RCW 9.94A.602, accompanied by the specific language alleging that the defendant "was armed with a deadly weapon, a firearm." This is because there is no comparable statute specifically authorizing a firearm special verdict. Such a statute would be unnecessary because, since a firearm is a type of deadly weapon, RCW 9.94A.602 already authorizes a firearm special verdict. See In re Restraint of Rivera, 152 Wash.App. 794, 801, 218 P.3d 638 (2009). Especially under the liberal construction applicable to postverdict challenges to an information, see State v. Kjorsvik, 117 Wash.2d 93, 105, 812 P.2d 86 (1991), we see no reason to insist upon a citation to RCW 9.94A.533 or to the specific subsection that spells out how much time is added for a firearm. We conclude the information was adequate to give notice to Hartzell and Tieskotter that the State was seeking a firearm enhancement. To the extent Delgado holds that Recuenco compels the opposite conclusion, we respectfully disagree.
¶ 64 If there was no charging error, what remains is instructional error. Instructions 12 and 13, the "to convict" instructions, informed the jury that the State had to prove beyond a reasonable doubt that each defendant "assaulted another person with a deadly weapon." Instruction 14 informed the jury that a firearm is a deadly weapon whether loaded or unloaded. Instruction 15 informed the jury that for purposes of a special verdict, the State "must prove beyond a reasonable doubt that defendants were armed with a deadly weapon at the time of the commission of the crime." This instruction included the definition of deadly weapon, which makes clear that a firearm is an example of a deadly weapon. But it did not tell the jury that the State was obliged to prove that the defendants were armed with a particular type of deadly weapon. And the special verdict form, to which the jurors answered "yes," asked only if each defendant was "armed with a deadly weapon at the time of the commission of the crime in Count I." It did not ask the jury to decide whether each defendant was armed with a firearm. Thus, the only type of enhancement specifically authorized by the jury's finding in the special verdict was a deadly weapon enhancement.
¶ 65 The question at this point is whether imposing a firearm enhancement where the special verdict is only for a deadly weapon is subject to harmless error analysis. Tieskotter did not raise any issue pertaining to the firearm enhancement until after Delgado was decided, along with the companion case of In Re Scott, 149 Wash.App. 213, 202 P.3d 985 (2009). In a supplemental brief raising a new assignment of error to the firearm enhancement, he contends that the error cannot be harmless.
*945 ¶ 66 In Scott, the jury found in a special verdict that the defendant had been armed with a deadly weapon, but the sentencing court entered a notation on the judgment and sentence to the effect that the jury's verdict found a firearm had been used. The Scott court noted that the sentencing court at the time (pre-Blakely) was authorized to find that the defendant was armed with a firearm and had it done so, the sentence would not be facially invalid. But instead, the judgment and sentence represented that the jury had made such a finding. The court concluded that the judgment and sentence misstated or misrepresented the jury's verdict and was "contrary to the jury's verdict", Scott, 149 Wash.App. at 222, 202 P.3d 985. For this reason, the court held the judgment and sentence to be facially invalid. Scott, 149 Wash.App. at 221, 202 P.3d 985.
¶ 67 In the present case likewise, the sentencing court checked a box on the judgment and sentence for each defendant indicating that a special verdict "for use of firearm" was returned on Count I. We decline to follow Scott, however, because we do not see the action taken by the court as misrepresenting or being contrary to the jury's verdict. A firearm is a deadly weapon as a matter of law, and the jury was so instructed. The imposition of a firearm enhancement was legally consistent with the jury's express finding that each defendant was armed with a deadly weapon.
¶ 68 What occurred here was not the type of error for which, under Recuenco III, harmless error analysis is not possible. The critical distinction from Recuenco III is that here, the State did charge the defendants with being armed with a firearm. Thus, the firearm enhancement was authorized by the charges.
¶ 69 The error in this case is more analogous to the omission of an element from a "to convict" instruction than to the facts of Recuenco III. See Rivera, 152 Wash.App. at 803-05, 218 P.3d 638. Such an error is subject to harmless error analysis under Neder. Recuenco II, 548 U.S. at 218-223, 126 S.Ct. 2546; Recuenco III, 163 Wash.2d at 441, 180 P.3d 1276; see also State v. Brown, 147 Wash.2d 330, 340, 58 P.3d 889. In order to hold the error harmless, the reviewing court must conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. Brown, 147 Wash.2d at 341, 58 P.3d 889.
¶ 70 Here, the court should have more specifically asked the jury to decide if the defendants were armed with a firearm. The failure to do so is harmless error if it is clear that the jury would have returned a "yes" answer to a special verdict form that specified "firearm" rather than the more general "deadly weapon."
¶ 71 Had there been any question about the particular type of deadly weapon used by the defendants in committing second degree assault, the error would not be harmless. But the only evidence at trial concerning weapons was evidence of firearms. It was uncontested that the persons who committed the assaults were armed with a firearm. A witness testified he heard gunshots and saw flashes from a gun or guns, and bullet holes and shell casings were found at Hoage's apartment. Furthermore, each of the defendants was charged with and convicted of unlawful possession of a firearm. Under these circumstances, the failure to get a specific firearm finding from the jury was harmless.
¶ 72 Recuenco II and Recuenco III leave open the question whether such an error can ever be harmless as a matter of state law. Hartzell's Brief of Appellant attempts a Gunwall[18] analysis to show that under article 1, §§ 21 and 22 of Washington's constitution, imposing a firearm enhancement not specifically authorized by the jury's special verdict cannot be harmless.[19] He concludes that "it is apparent from the rich history of jurors' preeminent role as fact-finders that applying a harmless error test to an erroneous weapons enhancement special verdict would undermine the intent of the *946 framers of article I, sections 21 and 22."[[20]] But the authorities he cites indicate only in a general fashion that the right to a jury trial may be broader under the state constitution than under the federal constitution. He has not demonstrated that our constitutional heritage requires courts to disregard punishment called for by the legislature because of a purely technical error such as occurred in this case.
¶ 73 Washington's Supreme Court acknowledged in Recuenco III that our state constitution in some circumstances provides greater protection for jury trials than the federal constitution. "Recuenco had a right to have a jury determine beyond a reasonable doubt if he was guilty of the crime and sentencing enhancement charged." Recuenco III, 163 Wash.2d at 440, 180 P.3d 1276. Hartzell and Tieskotter were not deprived of that right. On this record, the special verdicts necessarily reflect the jury's determination beyond a reasonable doubt that the defendants were armed with a firearm when they committed the assault. This is precisely what the defendants were charged with. The error was harmless.

POSSESSION OF FIREARM KNOWLEDGE ELEMENT
¶ 74 The trial court instructed the jury that to convict the defendants of first degree unlawful possession of a firearm, the State needed to prove the following elements beyond a reasonable doubt:
(1) That on or about April 7, 2007, the defendant had a firearm in his possession or control;
(2) That the defendant had previously been convicted of a serious offense; and
(3) That the possession or control of the firearm occurred in the State of Washington.[[21]]
"Knowing possession" is an essential element of the crime of unlawful possession of a firearm. State v. Anderson, 141 Wash.2d 357, 367, 5 P.3d 1247 (2000). The State, therefore, concedes that omitting the requirement of knowledge from Instruction 23 was an error of constitutional magnitude. The State contends, however, that the error does not require reversal.
¶ 75 An instruction that omits an element of the offense does not necessarily render the trial fundamentally unfair. Neder v. United States, 527 U.S. at 19, 119 S.Ct. 1827. To determine whether the omission of an element is harmless error, the court considers whether the omitted element was supported by uncontroverted evidence. Neder, 527 U.S. at 19, 119 S.Ct. 1827; State v. Jennings, 111 Wash.App. 54, 64, 44 P.3d 1 (2002), review denied, 148 Wash.2d 1001, 60 P.3d 1212 (2003).
¶ 76 In this case, the jury found each of the defendants guilty of second degree assault while armed with a deadly weapon for shooting into Hoage's apartment. The defendants did not defend against the charge of unlawful possession by claiming they did not know they possessed guns. Rather, they denied they were the ones who shot into the apartment. It is uncontroverted that the shooters, whoever they were, knew they were in possession of guns. Under these circumstances, omitting the element of knowledge from the instruction was harmless error.
¶ 77 Tieskotter contends that his counsel provided ineffective assistance because he did not object to the instruction omitting the element of knowledge. Because Tieskotter was not prejudiced by the omission, this argument fails.

SUFFICIENCY
¶ 78 Tieskotter argues that the evidence was insufficient to support his convictions for second degree assault and first degree unlawful possession of a firearm. A person is guilty of the crime of second degree assault if he "assaults another with a deadly weapon." RCW 9A.36.021(c). An intentional shooting is an assault. State v. Elmi, 166 Wash.2d 209, 216, 207 P.3d 439 (2009). Firearms are considered deadly weapons. RCW 9A.04.110(6). A firearm is "a weapon or *947 device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010(1). A person is guilty of first degree unlawful possession of a firearm if he has a firearm in his possession or control and he previously had been convicted of a serious offense. RCW 9.41.040(1)(a).
¶ 79 Evidence is sufficient if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bencivenga, 137 Wash.2d 703, 706, 974 P.2d 832 (1999). Circumstantial evidence is considered as reliable as direct evidence. State v. Goodman, 150 Wash.2d 774, 781, 83 P.3d 410 (2004). When deciding whether the evidence was sufficient to support a conviction, this court considers the State's evidence to be true and draws all reasonable inferences from the evidence in favor of the prosecution. Goodman, 150 Wash.2d at 781, 83 P.3d 410.
¶ 80 Tieskotter sets forth evidence that he argues is inconsistent with the jury's finding that he possessed a firearm and shot it at Hoage's apartment. But looking at the evidence in the light most favorable to the State, the evidence was sufficient for any rational trier of fact to find Tieskotter guilty of second degree assault and first degree unlawful possession of a firearm. Two eyewitnesses to the Pierce County crime testified that Tieskotter shot a .9 mm handgun. An expert witness testified in the State's case that the gun used in that shooting in Pierce County was the same weapon fired into Hoage's apartment. Other witnesses testified that Tieskotter and Hartzell were so close they were like brothers. Hartzell had been staying with Hoage a few days before the shooting, but she had asked him to leave. He sent her a threatening text message after the shooting. Tieskotter was using his girlfriend's car at that time, and a witness testified that the girlfriend's car was the one he saw when shots were fired at Hoage's apartment. Tieskotter stipulated that he had a prior conviction for a serious offense. This evidence was sufficient proof that Tieskotter was guilty of the assault and unlawful possession of a firearm.

MAXIMUM TERM
¶ 81 The maximum term for each of Tieskotter's convictions (assault with a deadly weapon in the second degree and unlawful possession of a firearm in the first degree) is 10 years. The trial court ordered Tieskotter to serve a term of 84 months with a 36-month firearm enhancement for his assault conviction and 116 months for his unlawful possession conviction, for a total term of 120 months. In addition, the court ordered Tieskotter to serve 18 to 36 months in community custody. The addition of the community custody term resulted in an overall sentence of 138 to 156 months, which exceeds the maximum term.
¶ 82 The State concedes that Tieskotter's case must be remanded to have the sentence corrected and argues that, even though Hartzell did not raise the issue, his case should be remanded, too. In light of a recent Supreme Court decision, the concession is well-taken:
We hold that when a defendant is sentenced to a term of confinement and community custody that has the potential to exceed the statutory maximum for the crime, the appropriate remedy is to remand to the trial court to amend the sentence and explicitly state that the combination of confinement and community custody shall not exceed the statutory maximum.[[22]]
Because there will be a remand to correct the error, Tieskotter's claim of ineffective assistance based on the error fails.

STATEMENT OF ADDITIONAL GROUNDSHARTZELL
¶ 83 In a statement of additional grounds for review pursuant to RAP 10.10, Hartzell argues that his conviction for assault in the second degree must be reversed and the charge dismissed because the court omitted the essential element of intent from the "to convict" instruction. Hartzell's argument fails because the instructions as a whole properly informed the jury that it must find *948 that he acted intentionally. Instruction 11 informed the jury that an assault is "an intentional touching or striking or cutting or shooting of another person," or "an act, with unlawful force, done with intent to inflict bodily injury upon another," or "an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury."
¶ 84 Hartzell argues that he was forced to waive his right to effective assistance of counsel because his court-appointed lawyer was not prepared for trial when his speedy trial deadline was nearing. Hartzell claims that he did not unequivocally waive his right to be represented.
¶ 85 A criminal defendant may waive his right to be represented by counsel and may choose instead to represent himself. State v. Woods, 143 Wash.2d 561, 585, 23 P.3d 1046 (2001). To waive the right of legal representation, the defendant must state his request unequivocally. State v. Vermillion, 112 Wash.App. 844, 851, 51 P.3d 188 (2002).
¶ 86 Although Hartzell said he wanted to represent himself because his counsel indicated he could not be prepared for trial before the speedy trial deadline passed, Hartzell also wanted to represent himself because he was confident that the State's evidence was insufficient to convict him. He said that the charges against him in Kitsap County were dropped and, therefore, he did not think the Thurston County prosecutor could connect him to the gun. The court questioned Hartzell thoroughly about his desire to represent himself and warned him of the dangers. Hartzell acknowledged that he understood the risks. Thus the record reflects that he voluntarily and unequivocally waived his right to counsel.

NO CUMULATIVE ERROR
¶ 87 Appellants argue that their convictions should be reversed based on cumulative error. That doctrine applies only if there were several trial errors, none of which standing alone is sufficient to warrant reversal, that when combined may have denied the defendant a fair trial. State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000). Because the defendants have not shown there were several trial errors, reversal based on cumulative error is not warranted.

CONCLUSION
¶ 88 The convictions of Hartzell and Tieskotter are affirmed. The judgment and sentence in each case is remanded for correction of the sentence consistent with Brooks.
WE CONCUR: AGID and GROSSE, JJ.
NOTES
[1] Report of Proceedings at 244-45.
[2] Report of Proceedings at 261-73.
[3] Report of Proceedings at 26.
[4] Report of Proceedings at 292.
[5] Report of Proceedings at 320.
[6] Report of Proceeding at 476.
[7] Report of Proceedings at 635.
[8] Clerk's Papers at 61.
[9] Clerk's Papers at 171.
[10] Report of Proceedings at 634.
[11] Brief of Respondent at 30.
[12] Report of Proceedings at 638.
[13] Brief of Respondent at 31.
[14] Report of Proceedings at 728, 732.
[15] Report of Proceedings at 694.
[16] Report of Proceedings at 723.
[17] Report of Proceedings at 733-34.
[18] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[19] Hartzell's Brief of Appellant, in contrast to his Statement of Additional Grounds, assumes that the firearm enhancement was properly charged.
[20] Appellant Hartzell's Brief at 52.
[21] Clerk's Papers at 197.
[22] In re Pers. Restraint of Brooks, 166 Wash.2d 664, 675, 211 P.3d 1023, 1028 (2009).