IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37201-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARK REYNOLDS WORTH, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Mark Worth appeals after being convicted of attempted murder in the first degree and drive-by shooting. He challenges both convictions and the firearm enhancement related to the former. We affirm.

## FACTS

*The shooting*

Around 4:00 p.m. on September 7, 2016, John "Cass" Gebbers was driving his truck down Old Highway 97 in Brewster, Washington. Gebbers saw a black BMW with dark tinted windows in his rearview mirror. Gebbers recognized the car as belonging to Mark Worth, whom he knew from their small-town community. Worth had followed Gebbers before.

Gebbers was on the phone with his son, Wade. He told Wade, "'Mark Worth is following me.'" Report of Proceedings (RP) at 424. Worth was approximately two car lengths away and Gebbers could see a large person in the driver's seat. Gebbers told Wade that Worth was trying to pass him and, when Worth accelerated into the passing lane, Gebbers saw that Worth's passenger side window was down. Gebbers braked and let Worth pass him. Gebbers kept driving and after about a quarter of a mile, Worth slowed down and they passed each other again. When Gebbers looked over, he saw Worth "lean[ing] over . . . out of his car with a black gun that had kind of a square end to it" and he "looked right down his arm and into his face and it was Mark Worth." RP at 444-45. Gebbers was "100 percent" certain he saw Worth. RP at 445. He thought the gun was a pistol.

Gebbers slammed on his brakes and put up his arm as his truck screeched to a halt. He heard a loud bang and then it felt like his arm was on fire. Wade, who was still on the phone, heard a gunshot and glass shattering. Wade heard his father scream, "'He shot me, he shot me, Mark Worth just shot me.'" RP at 472.

Gebbers stopped on the side of the road. His driver's side window was cracked and there was a bullet hole in the glass near his shoulder. He picked up his telephone and

said, "'Wade, are you still there. Mark Worth just shot me.'" RP at 447. Gebbers told Wade to call the police.

Worth kept driving up the highway before turning right. Gebbers turned his truck around and started driving to Brewster. He called 911 on the way and told them he had been shot by Worth. He drove to the police station and when he arrived, the police chief drove him to the hospital.

The hospital treated Gebbers for superficial cuts resulting from glass shards in his arm. He was released from the hospital that day.

*Law enforcement's investigation*

Sergeant Kevin Arnold of the Okanogan County Sheriff's Office responded to the area of the shooting. Initially, he was unable to locate Worth or the broken glass from Gebbers's truck window. The police received a report that Worth was driving near the hospital, put the hospital on lockdown, and requested backup for "an active shooter situation." RP at 482. The police received a later report that Worth was heading east into an orchard. They went to both locations but were unable to find Worth.

At 5:42 p.m., Sergeant Arnold asked dispatch to "ping" Worth's cell phone. RP at 526. He received coordinates showing Worth was about 30 miles away in Douglas County.

The next day, the police found Worth in Wenatchee. Worth was calm, polite, and willing to talk. Sergeant Arnold asked Worth if he shot at Gebbers, and Worth told the sergeant that "he didn't know what I was talking about." RP at 528. Sergeant Arnold asked Worth where he was at various times the day before, and Worth admitted to being in the area of the shooting a few times, but said he also visited several real estate locations. Worth mentioned some of the people he had seen on the day of the shooting at the locations he had visited.

Sergeant Arnold told Worth that he knew the cell phone data would put Worth in the area of the shooting. Worth agreed, admitting that he had been in the area around 3:45 p.m., but maintained he had not seen Gebbers. Worth said he would not have shot Gebbers, he had known him for a long time, and he considered himself a friend of the Gebbers family.

When asked if Worth owned any firearms, he said he had a Glock 9mm stolen from his vehicle the Sunday prior to the shooting. He admitted that he had not reported the theft, but he knew he should have.

The police found probable cause to arrest Worth and obtained a search warrant for his car. They found three cell phones in the car and a 9mm bullet under the driver's seat. They obtained a search warrant for the cell phones.

*Procedural history*

On September 12, 2016, the State charged Worth with attempted murder in the

first degree (count 1) and drive-by shooting (count 2).

*July 2019 motions in limine*

*Cell phone location map and related testimony*

Worth sought to exclude:

> <u>Any testimony, the basis of which is grounded in hearsay evidence</u>. This
> would include testimony by police about their opinions and level of
> knowledge, when the opinion or knowledge is based upon hearsay
> statements from other witnesses. . . .
>     . . . .
>         c. This would also include "map data" in reference to Detective
> Sloan's expected testimony. Detective Sloan's report states, "I contacted
> GIS Analyst Murray and had him print out a draft of the Worth cell phone
> location map. I made some corrections to the map and legend to make it a
> better representation." Detective Sloan cannot . . . testify to Analyst
> Murray's work and why [his] corrections to the map and legends make it a
> "better representation", nor has the State listed Analyst Murray in the
> State's witness list or any other records custodian for this data. Further, this
> evidence should be excluded because the defense has requested the map and
> associated data from Detective Sloan and contact information for Mr.
> Murray and all of his data.

Clerk's Papers (CP) at 26-28.

At the motion hearing on the morning of trial, the court required the State to make

an offer of proof. The State called Detective Kreg Sloan, who obtained and analyzed the

data. Detective Sloan explained how he made the map using the cell phone records

5

obtained from Verizon via the search warrant. He described his training, experience, and

process. He enlisted analyst Ted Murray to print the map in color. He testified, "I made

some corrections to the map to make it look better—you know, sizing the map, the—

legend—to make it a better representation. The data wasn't changed;—just the format

and the colors . . . ." RP at 125-26. Mr. Murray reprinted the map and the State

submitted it as an exhibit.

Worth reiterated his written arguments and emphasized there was no chain of

custody or records custodian from Verizon to authenticate the data. The court denied

Worth's motion to exclude the map and related testimony.

*Prior bad acts*

Worth also sought to exclude:

Allegations of prior bad acts by the defendant as prohibited by ER 404(b), including, but not limited to, prior alleged contact between Mr. Worth and Gebbers family members. . . .
. . . .
The State has not given notice of intent to introduce evidence under Evidence Rule 404(b) of other crimes, wrongs, or acts of Mr. Worth in order to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. If that is the State's intent, the Court should order the State to provide a list of witnesses it intends to call regarding this matter and a summary of the subject matter of that testimony. . . .
. . . .

Here, the very disparate types of actions and behaviors alleged, the age of the alleged events, and the fact that none resulted in either convictions or even charges filed suggest that the purpose and practical effect on the jury will be to show propensity to act "in conformity therewith" in the instant case, *see* ER 404(b). The evidence is not admissible to form intent.

CP at 29-32.

The State said it would try not to elicit testimony about prior acts but stated: "Cass Gebbers will say that he has been followed many times by Mr. Worth, that's why he was surprised on this particular occasion when Mr. Worth went past him, because usually Mr. Worth just followed Mr. Gebbers. That's within his knowledge, and his interaction." RP at 153. Worth agreed that he could not prevent Gebbers from testifying to his experiences.

The trial court ruled:

I don't know if just following somebody constitutes—Well, it's certainly not a crime, not a wrong. It may be an action, as such. It certainly doesn't seem to fit under [ER] 404(b) at this point—you know, with any testimony.
So basically I'm going to grant the motion here, but for [the] possibility that Mr. Gebbers may indicate[ ] he had been followed, as such.

RP at 154.

7

*Police as experts*

Worth also sought to "[p]reclude lay witnesses including police officers from testifying as experts." CP at 45 (emphasis omitted). The court granted the motion.

*Bullet*

Worth filed a motion in limine regarding the bullet found in his car, which read:

> No firearm was located that was determined to be of a type that matched the bullet, no testing was performed to compare damage to the vehicle or alleged injuries of the victim to this bullet, no ballistics expert has been disclosed, identified or listed as a State's witness. The fact that a bullet is located in a vehicle in Okanogan County when many individuals carry weapons in their vehicles and loose bullets can easily be dropped or fall in various place[s], is irrelevant to the ultimate question before the jury. Furthermore, it is highly prejudicial and as such should be excluded.

CP at 46-47.

The State argued the bullet is relevant because Worth allegedly shot a gun from his vehicle, and the bullet tends to show he had a gun in his car. Whether or not that bullet was associated with the crime is something that could be argued to the jury.

The trial court ruled:

> [F]rom the court's perspective, [the bullet] has some relevance, but—is it prejudicial. And without a clear understanding of [the] time frame,— court's going to find it would be prejudicial, at this point, to try to tie this 9 mm. at this time, without some form of expert, measurements, or something, measure bullet holes,—nobody's indicated—testimony about impacts . . . those kinds of things which—require an expert.

8

So, court's going to . . . grant the request to exclude—testimony about finding the bullet.

RP at 165.

*Trial*

Worth proceeded to a jury trial on August 6, 2019.

*State's case*

The State called Reggie Collins, chief executive officer of Chelan Fruit in September 2016. Collins testified that he had seen Worth at a Chelan Fresh[1] board meeting on the day of the shooting. Gebbers was there with his son, Mac, among other board members. Collins encountered Worth—who he did not recognize—during the lunch hour and asked if he could help him. Worth replied no, and said, "'I'm here to find Cass and Mac Gebbers.'" RP at 381. Collins offered to bring Worth to them, but Worth responded, "'No, I'll find 'em later,'" and left. RP at 381. Collins later identified Worth in a photomontage.

Jerrod Riggan worked in the building where the Chelan Fresh board meeting was held. Riggan knows Worth "[v]ery well" because Worth was Riggan's realtor. RP at 406. On the day of the shooting, Riggan saw Worth and they engaged in small talk before

---

[1] Chelan Fresh is a sales and marketing agency representing numerous farms in Central Washington. Worth is not affiliated with Chelan Fresh.

Riggan asked Worth what he was doing there.  Worth responded, "looking for Cass and Mac."  RP at 407.  Riggan said, "'[They are] probably back here if you want to come back with me.'"  RP at 407.  Worth said, "'Yeah,'" and the two walked toward the lunch area before Worth said, "'No, I'll talk to him later.'"  RP at 408.  Worth and Riggan walked back out into the hallway and chatted some more.  Riggan did not think Worth was acting strange.

Detective Sloan testified that he had 120 hours of specialized training for tracking cell phones and analyzing cell phone data.  He received this training from the U.S. Marshal's Service, the Federal Bureau of Investigation (FBI), and the National Association of Technical Investigators.  Detective Sloan explained that the police obtain data from cell phone companies, usually in spreadsheet format, which they later enter into computer programs.

Detective Sloan analyzed the cell phone data to find out where Worth was throughout the day of the shooting.  He received the data from Detective Rob Heyen, who had obtained it from Verizon.  He entered the data into a program that created a map of Worth's locations that day: he was mostly between Brewster and Okanogan.  The map shows Worth was in the Chelan area around 12:51 p.m. and the shooting area both before and after 4:20 p.m.  Detective Sloan explained that one of the towers (an omnidirectional)

10

sometimes creates inaccuracies, showing that a phone "hits two to five miles out when the phone was actually 32 miles" out. RP at 510. He is familiar with that tower: "It's just an anomaly in the system," which leads to some data points that "'don't make sense.'" RP at 510, 512.

*State's motion for reconsideration*

During trial, the State moved for reconsideration on the bullet found in Worth's car. The court heard argument on the third day of trial.

The State argued:

> He's charged with drive-by shooting and attempted premeditated murder in the first degree armed with a firearm. So, whether or not he has a firearm and ammunition is relevant to the case.
> Now we did not recover the firearm. We were able to recover fragments of the bullet . . . . They did analysis and they said it was too fragmented and they couldn't do any analysis that would show any evidentiary value. . . . So I wouldn't say that there are no forensic tests or opinions in this matter.
> But be that as it may, as he's charged with a firearm offense, the bullet in his vehicle—the test for relevancy is it just tends to prove, and it has to be just a slight showing. And the fact that he would have ammunition in his car goes to the fact as to whether or not [he] have [sic] a firearm in his car.
> So I believe that it is relevant, and that can be argued, and that I don't see any unfair prejudice.

RP at 549-50.

11

The court noted that previously, neither party had disclosed that Worth owned a gun or that he lost it the Sunday prior to the shooting. After hearing testimony that Worth owned a Glock 9mm handgun and Gebbers described seeing Worth with a weapon that could have been a pistol, the court ruled:

> But when we get to the—the bullet issue, from the court's perspective it does have relevancy. It—basically in a sense can be utilized to confirm that within the car of . . . Mr. Worth that there was found a bullet cartridge.
> And so the court is finding that the mere introduction or use of that bullet (inaudible) would not from the court's perspective inflame the jury, cause an emotional response—so great as such that it would warrant the court to exclude it.
> It does have relevance, as—we're talking, as I indicated, discharge of a handgun. We're also talking about acknowledgement of a Glock pistol in this matter.
> So the court is going to change its prior ruling, based on additional testimony and additional facts that have come out in this trial. I will allow the introduction of the bullet.
> . . . I'm not seeing the prejudicial impact of that upon Mr. Worth. It's factual. He acknowledge[s] that he had a Glock 9 mm. and upon search of his vehicle there was found a 9 mm. bullet in the car.

RP at 555-56.

Trial resumed with Detective Heyen's testimony. Detective Heyen examined Gebbers's truck after the shooting. He determined there were two shots fired into the truck. One of the bullets went through the driver's side window, hit the headrest, and exited out the headliner. Bullet fragments were recovered from the headliner. The

12

second bullet went through the driver's side door and left some bullet fragments therein. There was dried blood inside the door and on the armrest. Detective Heyen also examined the crime scene and found skid marks that matched Gebbers's truck tires, but was unable to find spent cartridges from the shots fired.

Gebbers testified that he recognized Worth's car following him on the day of the shooting. Worth had followed him in the past on several occasions. A few days before, Gebbers and his son were riding bicycles when Worth started driving "super-slow" behind them for about one mile. RP at 426. Gebbers thought Worth was going to run him over. A few weeks before the shooting, Worth came to Gebbers's house uninvited to talk about water rights. Gebbers had no business dealings with Worth and told him to speak to the person in charge of those matters. A year and one-half prior to the shooting, Worth followed Gebbers for approximately nine miles from Brewster to Bridgeport. On that day, Worth followed Gebbers into a store and trailed him afterward, despite Gebbers varying his speed from 20 to 100 miles per hour. Worth followed Gebbers—who was driving with someone else—in a brown pickup truck. Gebbers saw Worth clearly and also recognized the brown pickup as Worth's because "he drove it all over town." RP at 435.

Gebbers testified to what occurred immediately after the shooting:

13

First, I got out because in that period of slamming my brakes on a cream-colored little car with two Hispanics had drove up behind me. And I got out, turned to them, and I said, "Stop. Stop. That guy in the black car just shot me." Their eyes were as big as saucers, and they started turning their car around in the road and I never saw them again.

RP at 449-50.

Defense counsel opted not to call any witnesses.

*Jury instructions and verdict*

Worth objected to the State's proposed instructions on expert testimony, arguing the issue was raised in Worth's motions in limine and no officer was specially qualified as an expert. The court responded:

[An expert] is a witness who has special training, education or experience may be allowed to express an opinion. I don't know if there was particularly an opinion . . . other than—the testimony of . . . Det. Sloan, for example, [who] . . . printed the data, used a program to do that. He's been . . . trained to do that.
    I don't necessarily qualify him as what we classically call an expert—as such.

CP at 679.

After a short discussion, the court stated, "[Detective Sloan] is—testifying he has special training, he has experience." RP at 682. Worth again noted that the State never listed Detective Sloan as an expert or otherwise notified Worth of its intention to utilize him as such. The court asked whether Worth's counsel was provided the information that

14

Detective Sloan would testify to and she said yes, but she was objecting to the fact that he

was not specifically listed as an expert. The court decided to give the instruction over

Worth's formal objection.

Worth had no other objections to the State's proposed instructions.

The court instructed the jury that it must deliberate in an attempt to reach a

unanimous verdict. It further instructed:

> A person commits the crime of Attempted Murder in the First
> Degree when, with a premeditated intent to cause the death of another
> person, he or she attempts to cause the death of such person or of a third
> person.

CP at 79 (Instruction 9). The next instruction read: "A person commits the crime of

Attempted Murder in the First Degree when, with intent to commit that crime, he or she

does any act that is a substantial step toward the commission of that crime." CP at 80

(Instruction 10). The "to-convict" instruction provided that, in order to convict Worth of

attempted murder in the first degree, the jury must find the State proved beyond a

reasonable doubt:

> (1) That on or about September 7, 2016, Mark Worth did an act that
> was a substantial step towards the commission of Murder in the First
> Degree[;]
> (2) That the act was with the intent to cause the death of John
> William Cascade Gebbers;
> (3) That the intent to attempt to cause the death was premeditated;
> and

15

(4)  That any of these acts occurred in the State of Washington.

CP at 84 (Instruction 14).  A later instruction defined premeditation.

The court provided the jury with a special verdict form, to answer only if it found

Worth guilty of count 1, attempted murder in the first degree.  The verdict form asked:

> Was the Defendant, Mark Worth, armed with a firearm at the time of the
> commission of the crime in Court [sic] 1: Attempted Murder in the First
> Degree [?]
>
> Answer 1: (Write "yes" or "no") _____

CP at 94.

The jury found Worth guilty as charged.  It also answered "yes" to the special

verdict.  CP at 94.

*Review hearing and sentencing*

On October 25, 2019, after trial but before sentencing, Worth wrote a lengthy letter

to the court detailing his grievances with his counsel and the trial itself.  In the letter,

Worth asserted that his counsel failed to interview and call witnesses, failed to subpoena

and present certain evidence, and failed to ask various questions of witnesses who did

testify.

The next week, the court addressed some of Worth's concerns at a review hearing.

It found that Worth's concerns did not warrant new counsel at this stage in the

proceedings. The court wanted to hear more from Worth's counsel, who was not available that day, and continued the hearing to October 28, 2019.

At the continued hearing, the court denied Worth's request to replace counsel and recommended he work with current counsel moving forward. The court urged Worth's counsel to continue obtaining statements via investigators and set the matter for sentencing.

On November 15, 2019, the court sentenced Worth to 300 months on count 1, which included a 60-month firearm enhancement, and 32 months on count 2 to run concurrently. Worth timely appealed.

## ANALYSIS

1. SUFFICIENCY OF EVIDENCE: PREMEDITATION

Worth contends the State failed to present sufficient evidence of premeditation and asks this court to dismiss his attempted murder conviction. The State argues premeditation is not an essential element of attempted first degree murder, but even if it were, sufficient evidence supports the jury's verdict.

We first address the parties' disagreement over whether the State had to prove premeditation. It did. The law of the case doctrine requires that in a criminal case tried to a jury, the State must prove otherwise unnecessary elements of the charged crime that are

included without objection in the "to-convict" jury instructions. *State v. Johnson*, 188

Wn.2d 742, 754, 399 P.3d 507 (2017). Here, element three of the "to-convict" instruction

for attempted murder includes premeditation.

We now turn to the question of whether the State presented sufficient evidence of

premeditation. "A claim of insufficiency admits the truth of the State's evidence and all

inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192,

201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable;

however, "inferences based on circumstantial evidence must be reasonable and cannot be

based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

Premeditation involves "more than a moment in point of time," RCW

9A.32.020(1), and the State must prove that the defendant had more than a "'mere

opportunity to deliberate.'" *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592

(2016) (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)). Four

characteristics are relevant to establishing premeditation: (1) motive, (2) procurement of a

weapon, (3) stealth, and (4) killing method. *Pirtle*, 127 Wn.2d at 644. The second and

third elements may be shown by evidence of planning. *Id.* "Premeditation may be proved

by circumstantial evidence where the inferences drawn by the jury are reasonable and the

evidence supporting the jury's finding is substantial." *Id.* at 643.

The record supports a strong inference that Worth formulated a plan.  He sought out Gebbers, but declined to actually talk to him, and said he would "'find 'em later.'" RP at 381.  He later found and followed Gebbers on a rural road, accelerated past him once, then slowed down.  When Gebbers neared, Worth pointed a pistol out of his passenger side window and shot at Gebbers's truck not once—but twice.

The State did not present evidence of a motive, but it did present evidence of stealth and method of killing sufficient for a jury to find premeditation.  Reasonable inferences from the evidence permitted the jury to believe that Worth formed a plan to kill Gebbers.  This plan likely started hours earlier, as nothing that Gebbers did that day precipitated Worth's actions.  But even if the plan began after Worth accelerated past Gebbers, this was sufficient to show premeditation.  This is because slowing down, grabbing a gun, rolling down a window, and shooting twice involves a series of acts that occur over sufficient time to provide an opportunity to reflect and deliberate.  We conclude that the State presented sufficient evidence that Worth premeditated before attempting to kill Gebbers.  *See State v. Aguilar*, 176 Wn. App. 264, 273, 308 P.3d 778 (2013) ("A wide range of proven facts will support an inference of premeditation.").

2. "TO-CONVICT" INSTRUCTION MISSTATED PREMEDITATION ELEMENT

Worth contends his constitutional right to due process was denied because the "to-convict" instruction for attempted murder relieved the State of its burden of proving every element of that crime. Specifically, he argues the instruction did not require the State to prove that he acted with premeditated intent to kill. We conclude that the error was harmless beyond a reasonable doubt.

Worth's argument focuses on the third element of the attempted murder "to-convict" instruction. That instructional element stated, "That the intent to attempt to cause the death was premeditated." CP at 84. Worth argues this required the State to prove that his *intent* was premeditated, rather than his *attempt to kill* was premeditated, and the former is a misstatement of the law.

Generally, an appellant may not raise an issue for the first time on appeal. RAP 2.5(a). Worth did not object to the jury instruction in question. If he had, the trial court would have been given an opportunity to correct it.

An exception to RAP 2.5(a) permits review of an unpreserved error when the appellant claims a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). To meet this standard, Worth must show (1) that the error is manifest and (2) truly of constitutional dimension. *O'Hara*, 167

Wn.2d at 98. "An error is manifest when it has practical and identifiable consequences in the trial of the case." *State v. Stein*, 144 Wn.2d 236, 240, 27 P.3d 184 (2001). "[T]he focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review." *O'Hara*, 167 Wn.2d at 99-100. As an appellate court, we place ourselves in the shoes of the trial court and ask whether, given what the trial court knew at the time, it could have corrected the claimed error. *Id.* at 100.

First, an inadequate "to-convict" instruction affects a defendant's constitutional rights. *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Second, the error in the instruction was obvious. The State was required to prove that Worth's attempt to kill was premediated, not his intent. *State v. Price*, 103 Wn. App. 845, 851-52, 14 P.3d 841 (2000).

A manifest constitutional error may still be subject to harmless error analysis. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). We next determine if the erroneous instruction was harmless beyond a reasonable doubt. The evidence at trial firmly established both premeditation and intent. Premeditation was shown by evidence of a plan. Worth did not contest premeditation. Nor was intent contested. No one suggested that the shooting was accidental. Worth's defense at trial was that he was not

21

the shooter. We conclude that the erroneous wording of the third element in the attempted murder "to-convict" instruction was harmless beyond a reasonable doubt.

       3.       FIREARM ENHANCEMENT

Worth contends the imposition of an additional 60-month mandatory minimum based on the firearm enhancement violated his right to a unanimous jury verdict. He further argues the trial court's omission of the form definition instruction for the firearm enhancement was error. We set forth the relevant law and standards of review before addressing the issues in turn.

Both the state and federal constitutions protect a defendant's right to a jury trial by requiring that his or her sentence be authorized by the jury's verdict. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 21, 22; *State v. Williams-Walker*, 167 Wn.2d 889, 896, 225 P.3d 913 (2010). The trial court must instruct the jury that the State is required to prove every element of the charged crime beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). This requirement applies to facts that increase the maximum penalty for a crime, including sentencing enhancements. *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The State must prove these facts beyond a reasonable doubt and the jury must reach a unanimous verdict on all enhancements. *Ramos v. Louisiana*, __ U.S. __,

22

140 S. Ct. 1390, 1395, 206 L. Ed. 2d 583 (2020); *Alleyne v. United States*, 570 U.S. 99, 115-16, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).

### *Enhancement instruction*

Worth argues the trial court's failure to instruct the jury that it must unanimously find the State proved the firearm enhancement beyond a reasonable doubt is reversible error. The State argues Worth waived this claim by not objecting to the instructions below. Thus, as a preliminary matter, we determine whether the trial court's instructions contained a manifest error affecting Worth's constitutional rights, allowing him to bring this challenge on appeal despite failing to preserve it below.

As discussed above, we generally will not review unpreserved claims unless they are manifest errors affecting constitutional rights. RAP 2.5(a)(3); *O'Hara*, 167 Wn.2d at 98. To meet this standard, Worth must show (1) that the error is manifest and (2) truly of constitutional dimension. *O'Hara*, 167 Wn.2d at 98. A manifest constitutional error may still be subject to harmless error analysis. *McFarland*, 127 Wn.2d at 333.

Here, the trial court's failure to give instructions accompanying the firearm enhancement was a manifest error affecting Worth's constitutional rights. The jury was given no instruction on the special verdict whatsoever. The proper instruction on the

23

firearm enhancement—which is routinely given alongside the special verdict form—

reads:

> For the purposes of a special verdict, the State must prove beyond a reasonable doubt that the defendant was armed with a firearm at the time of the commission of the crime [in Count __].
> [A person is armed with a firearm if, at the time of the commission of the crime, a firearm is easily accessible and readily available for offensive or defensive use. The State must prove beyond a reasonable doubt that there was a connection between the firearm and the defendant . . . . The State must also prove beyond a reasonable doubt that there was a connection between the firearm and the crime. . . .]
> . . . .
> A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

2.10.01, at 64 (5th ed. 2021) (WPIC).

This instruction is crucial because it sets out what the State must prove, beyond a

reasonable doubt, in order for the jury to return a special verdict finding that Worth was

armed. When the jury is not instructed on all elements of an offense or sentencing

enhancement, a defendant's constitutional rights are implicated. *Stein*, 144 Wn.2d at 241;

*O'Hara*, 167 Wn.2d at 100-01; *Alleyne*, 570 U.S. at 115-16.

Further, the court did not give a concluding instruction with the special verdict on

the reasonable doubt standard and unanimity. The trial court should have given the

following instruction to the jury:

24

> You will also be given a special verdict form for the crime charged in count 1. If you find the defendant not guilty of this crime, do not use the special verdict form. If you find the defendant guilty of this crime, you will then use the special verdict form and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer the special verdict form "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer.

*See* 11A WPIC 160.00, at 792.

This instruction is important because it sets out what the State must prove in order for the jury to return the special verdict and restates the reasonable doubt standard. The failure to correctly instruct the jury in this manner is obvious from the record; thus, it meets the standard of manifest constitutional error warranting review. We proceed to analyze whether this error was harmless.

### *Harmless error*

The parties dispute whether the harmless error analysis applies to Worth's instructional challenge. Worth contends the failure to properly instruct on the reasonable doubt standard can never be harmless. He relies on *Sullivan*, 508 U.S. at 278, *Williams-Walker*, 167 Wn.2d at 900-02, and *State v. Recuenco*, 163 Wn.2d 428, 442, 180 P.3d 1276 (2008). But a careful examination of the case law weakens his argument.

In *Recuenco*, our Supreme Court held that a sentence based on a firearm enhancement that was neither charged, sought at trial, nor found by a jury could never be

25

harmless. 163 Wn.2d at 442. Then, in *Williams-Walker*, the court explained that errors that occur *after* the jury verdicts are reached (during sentencing) are also not subject to harmless error analysis because they involve a trial court's unauthorized imposition of a sentence. 167 Wn.2d at 900-01.

Here, the enhancement was charged and sought at trial, and the error occurred *before* the verdicts were reached, when the jury was given deficient instructions. Thus, *Recuenco* and *Williams-Walker* do not apply. Rather, our question is whether the errors in the firearm enhancement instructions were harmless beyond a reasonable doubt. We conclude that they were.

The jury unanimously decided that Worth committed a drive-by shooting, i.e., it found the State proved beyond a reasonable doubt that Worth "recklessly discharge[d] a firearm." CP at 85. The drive-by shooting and the attempted murder arose from the same conduct: Worth shot a gun at Gebbers's truck. Thus, while the jury was not specifically instructed that the State must prove Worth was armed with a firearm at the time of the attempted murder, it necessarily concluded he was armed when it returned its verdict on the drive-by shooting. Further, the second paragraph of WPIC 2.10.01 (excerpted above) need not be used in cases, such as here, where "the weapon was actually used and displayed during the commission of the crime." *See* 11 WPIC 2.10.01, note on use, at 64.

26

*Omission of firearms definition in enhancement*

Within his argument on instructional deficiencies, Worth notes that although the

trial court defined "firearm" in its instructions, it did not tell the jury to use this definition

in the special verdict form.[2]  But Worth did not object to this alleged deficiency below,

and he cannot now do so on appeal.

In *O'Hara*, the defendant argued for the first time on appeal that the trial court

failed to give a full statutory definition of "malice" in the jury instructions.  167 Wn.2d at

97.  The court concluded that this claim of error could not be raised for the first time on

appeal, reasoning: "To the extent the trial court erred in providing an instruction on the

definition, the error would only be an error in defining a technical term and not an error of

a constitutional magnitude."  *Id.* at 107.

*O'Hara* controls here.  The jury was given a constitutionally adequate definition of

firearm.  That the special verdict form did not refer back to this definition or repeat it in

the verdict form does not rise to a manifest constitutional error warranting review.

In sum, the instructions as a whole apprised the jury of the reasonable doubt

standard, the requirement of unanimity, and the definition of firearm.  The special verdict

---

[2]  Prior to the drive-by shooting "to-convict" instruction, the court defined "firearm" as a "weapon or device from which a projectile may be fired by an explosive such as gunpowder."  CP at 87.

form asked whether Worth was "armed with a firearm at the time of the commission of the . . . Attempted Murder in the First Degree." CP at 94. It is unlikely the jury was confused about the special verdict findings. Thus, while the trial court erred in failing to adequately instruct the jury on the enhancement, the verdict would certainly have been the same with proper instructions.

The instructional error on the firearm enhancement warrants review because it is one of manifest constitutional importance, but it was harmless beyond a reasonable doubt.

4.      DOUBLE JEOPARDY

Worth contends his convictions for attempted murder in the first degree and drive-by shooting violate double jeopardy. He argues they are the same in fact and law because they both punish him for a single act that occurred at the same time and place against the same victim. We disagree with his double jeopardy analysis.

Both the state and federal constitutions prohibit double jeopardy. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The prohibition on double jeopardy generally means the State cannot twice prosecute someone for the same offense after being acquitted or convicted of that offense, or impose multiple punishments for the same offense. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d 78 (2014). Double jeopardy is violated even if the sentences are imposed concurrently. *Ball v. United States*, 470 U.S.

28

856, 864-65, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985). We review alleged double

jeopardy violations de novo. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010).

Notably, while this is a constitutional issue, it is ultimately "a question of statutory

interpretation and legislative intent." *State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072

(1998). "The legislature is tasked with defining criminal offenses, and the prohibition on

double jeopardy imposes '[f]ew, if any, limitations' on that power." *Villanueva-*

*Gonzalez*, 180 Wn.2d at 980 (alteration in original) (quoting *Sanabria v. United States*,

437 U.S. 54, 69, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978)). Thus, we are tasked with

determining whether the legislature intended to punish drive-by shooting separately from

attempted first degree murder.

There are two types of double jeopardy analyses. *Id.* One is the "unit of

prosecution" analysis, which "applies when a defendant has multiple convictions under

the same statutory provision," and asks "'what act or course of conduct has the

Legislature defined as the punishable act.'" *Id.* (quoting *Adel*, 136 Wn.2d at 634). The

other is the *Blockburger*[3] analysis. It applies when a defendant has convictions under

different statutes, and asks whether the convictions were "'the same in law and in fact.'"

---

[3] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed 306 (1932).

*Id.* at 981 (quoting *Adel*, 136 Wn.2d at 632).  This case requires us to apply the

*Blockburger* analysis.

*The offenses are not the same in law*

Attempted murder in the first degree and drive-by shooting each contain an

element that is absent from the other.  *See* RCW 9A.28.020; RCW 9A.32.030;[4]

RCW 9A.36.045.[5]  Drive-by shooting can only occur when a firearm is discharged from

(or in the vicinity of) a vehicle.  RCW 9A.36.045(1).  Attempted murder requires an

intent to cause the death of a person and an act constituting a substantial step toward the

commission of the murder.  RCW 9A.28.020(1); RCW 9A.32.030(1)(a).  Moreover, the

mens rea requirement for drive-by shooting is recklessness whereas the mens rea for

attempted first degree murder is specific intent.  The elements of the offenses do not

preclude convictions for both drive-by shooting and attempted murder in the first degree.

---

[4] RCW 9A.28.020(1) defines criminal intent: "with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime."  RCW 9A.32.030(1)(a) defines first degree murder: "With a premeditated intent to cause the death of another person, he or she causes the death of such person . . . ."

[5] RCW 9A.36.045(1) provides: "A person is guilty of drive-by shooting when he or she recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge."

30

Worth concedes that the abstract legal elements of the offenses are different, but argues that it is not fatal to his position. Citing *State v. Hughes*, 166 Wn.2d 675, 683, 212 P.3d 558 (2009), he argues that double jeopardy can be violated even when each offense requires elements the other does not.

Hughes was convicted of second degree rape based on the victim's inability to consent due to mental incapacity or helplessness and second degree rape of a child based on the victim's inability to consent due to age. *Id.* at 679. The court noted that both rape convictions were based on the incapacity to consent due to the victim's status; thus, while the elements were facially different, they did not pass the same elements test. *Id.* at 683-84.

*Hughes* is inapposite. Worth's convictions are not similar to one another: the elements of drive-by shooting and attempted murder are more than abstractly different. Although the convictions were based on a single act, they involve numerous distinct elements and different mens rea requirements. *Hughes* does not support Worth's position, and we move on to the factual prong of the double jeopardy analysis.

*The offenses are not the same in fact*

Here, the State charged Worth with (1) attempted murder in the first degree of Gebbers and (2) drive-by shooting of Gebbers. The facts required to prove that Worth

31

committed the attempted murder do not also prove that he committed the drive-by shooting. Worth committed attempted murder when he, with premeditated intent to cause the death of Gebbers, took a substantial step in attempting to cause the death of Gebbers. The substantial step Worth took was firing shots toward Gebbers that left two bullet holes in Gebbers's truck. These facts prove that Worth committed the attempted murder of Gebbers. But to prove this crime, the State was *not* required to prove that Worth discharged a firearm from a vehicle—an essential element of drive-by shooting. Thus, the facts required to convict Worth of attempted murder cannot also prove drive-by shooting.

Likewise, the facts required to prove that Worth committed drive-by shooting do not prove that he committed attempted murder. Worth committed drive-by shooting when he recklessly discharged a firearm from his vehicle and that discharge created a substantial risk of death or serious physical injury to another (Gebbers). Under RCW 9A.36.045(2), the act of discharging a firearm from a moving vehicle suffices to establish the shooter's recklessness. The discharge risked the death or serious injury of other motorists or people nearby. These facts prove that Worth committed drive-by shooting.

32

However, those same facts are not sufficient to prove that Worth committed attempted murder in the first degree. As explained above, attempted murder requires an intent to commit that offense and a substantial step toward the commission of that offense. Proof of a drive-by shooting does not establish that Worth intended to murder Gebbers. Therefore, the facts proving drive-by shooting cannot also prove attempted murder. The offenses are not the same in fact.

We conclude that Worth's convictions for attempted murder in the first degree and drive-by shooting do not violate double jeopardy.

5.   EVIDENTIARY AND INSTRUCTIONAL ERRORS

Worth contends that two evidentiary errors and an instructional error deprived him of a fair trial and warrant reversal of his convictions. We address each issue in turn.

A.   *Evidentiary errors*

There are instances where the erroneous introduction of evidence may violate a defendant's constitutional right to due process. This occurs when a court improperly admits evidence that is "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)).

We review evidentiary rulings that require the trial court to weigh various factors for abuse of discretion. *State v. Gonzalez-Gonzalez*, 193 Wn. App. 683, 689, 370 P.3d 989 (2016). A court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017). We will not find abuse of discretion simply because we would have decided that issue differently; rather, we must be convinced that "'no reasonable person would take the view adopted by the trial court.'" *Id.* (emphasis and internal quotation marks omitted) (quoting *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)). An erroneous evidentiary ruling does not warrant reversal unless the defendant can show prejudice. *Gonzalez-Gonzalez*, 193 Wn. App. at 689.

(1) *Bullet*[6]

Worth contends the trial court erred in admitting evidence of the bullet recovered from his car because it was irrelevant, and, even if relevant, its probative value was outweighed by its prejudicial effect. We disagree.

---

[6] Worth's appellate attorney hints that this issue concerns the right to bear arms, but does not develop that argument. Worth himself raises the Second Amendment to the United States Constitution issue in his statement of additional grounds for review.

(a)     *Relevancy*

Evidence must be relevant to be admissible.  ER 402.  Evidence is relevant if it

tends "to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence."  ER 401.

The relevancy threshold is very low and even minimally relevant evidence is admissible.

*State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).  However, the proffered

evidence must have a logical relationship with any fact to be proved, not a latent or

conjectural connection.  *State v. Wilson*, 38 Wn.2d 593, 616, 231 P.2d 288 (1951).  For

instance, ammunition from the gun used in an actual offense is relevant and admissible.

*State v. Hoffman*, 116 Wn.2d 51, 91-92, 804 P.2d 577 (1991).  Ammunition relevant to

the charged offenses may also be admissible.  *Id.*  Conversely, weapons and ammunition

unrelated to the case are not admissible.  *State v. Jeffries*, 105 Wn.2d 398, 412, 717 P.2d

722 (1986).

Worth argues the bullet recovered from his car is irrelevant because the State did

not prove its connection to the shooting.  He argues that because the crime laboratory was

unable to match the bullet fragments found in Gebbers's truck to the bullet in his car, the

bullet should have been excluded.  He distinguishes numerous cases to support his

position, which we discuss below.

35

In *Hoffman*, the trial court admitted the defendant's .22 caliber pistol, which was fired during commission of the crime, as well as testimony regarding several of the defendant's weapons that were not forensically matched to the crime. 116 Wn.2d at 91-92. Our Supreme Court held that all of this evidence was relevant, reasoning: "Guns do not necessarily have to be used in the commission of the crime to be admissible." *Id.* at 92. It found the testimony and guns were relevant to the defendant's behavior leading up to the crime, and the police officer's knowledge of those guns justified the arrest. *Id.*

In *Jeffries*, the trial court admitted evidence that the defendant possessed a .22 caliber rifle belonging to the murder victims, as well as .22 caliber bullets. 105 Wn.2d at 412. The defendant argued the admission of the guns and ammunition violated ER 404(b) because the State did not prove they were used in the commission of the crime. *Id.* Our Supreme Court disagreed, holding that the gun "could have been the murder weapon" and the jury could reasonably infer that the defendant stole the gun and used it to murder the victims. *Id.* The court further reasoned that an FBI agent testified that the bullets recovered from the victims could have come from the box of .22 caliber bullets in the defendant's possession. *Id.*

In *State v. Luvene*, 127 Wn.2d 690, 708, 903 P.2d 960 (1995), the defendant sought to exclude evidence that he possessed a gun before and after the crime occurred,

arguing the gun had not been first identified as the murder weapon. There, the victims were shot with a weapon later identified as a black .380 caliber handgun. *Id.* The defendant possessed such a weapon, which the court found highly relevant under ER 401 and ER 402. The court reasoned, "if the jury could infer from the evidence that the weapon could have been used in the commission of the crime, then evidence regarding the possession of that weapon is admissible." *Id.*

In *State v. Hartzell*, 156 Wn. App. 918, 926, 237 P.3d 928 (2010), the defendants were charged with assault while armed and unlawful possession of a firearm. The trial court admitted evidence connecting the guns used in the charged crimes to two unrelated gun incidents. *Id.* at 930. The defendants argued the admission of the evidence violated ER 404(b) because it was offered to show their propensity to commit gun crimes. *Id.* Division One of this court disagreed: "[T]he evidence was offered merely to show that the weapons used [in the crime] were found shortly thereafter in the possession of [the defendants], thus tending to make it more probable that they were the individuals who did the shooting . . . ." *Id.* at 932. It held the evidence was circumstantial evidence connecting the defendants to the particular guns and was not admitted to show general propensity to commit gun crimes. *Id.*

Worth argues that in the aforementioned cases, the State proved some connection between the weapon or ammunition, the defendant(s), and the crime. He emphasizes that the State failed to connect the bullet in his car to the shooting. We agree with Worth that in all of the cases he cited, more evidence was presented to link—albeit sometimes circumstantially—the weapons or ammunition to the charged crime. Here, the crime laboratory was unable to match the bullet fragments found in Gebbers's truck to the 9mm bullet found in Worth's vehicle. However, the bullet matched the gun Worth admittedly owned and was at least minimally relevant to a drive-by shooting that requires a firearm be discharged from a vehicle. The existence of the bullet *could* permit a reasonable jury to infer that Worth carried a gun in his car and used that gun to shoot at Gebbers. The instant case is most like *Hoffman*, where the challenged evidence was admissible despite (some of it) lacking a forensic match to the charged offense. Given the low threshold for relevancy, the trial court did not abuse its discretion in finding the bullet at least minimally relevant.

(b)     *Unduly prejudicial*

Even if evidence is relevant, a trial court must exclude it when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. Unfair prejudice is that which is inflammatory, likely to

arouse an emotional response rather than a rational decision, and has an undue tendency to suggest the jury make a decision on an improper basis. *State v. Cronin*, 142 Wn.2d 568, 584, 14 P.3d 752 (2000); *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). Like other evidentiary rulings, trial courts have considerable discretion in balancing the probative value of evidence against its potentially prejudicial impact. *Barry*, 184 Wn. App. at 801.

The trial court did not abuse its discretion in finding the evidence of a single 9mm bullet in Worth's car was not unduly prejudicial. The bullet was the same type and caliber as Worth's gun, which he alleged was stolen but did not report missing. The evidence permitted the inference that Worth carried his gun and ammunition in his car at some point in time. Worth himself argues, "There is nothing sinister about possessing a bullet." Appellant's Br. at 41. A single bullet in a car is unlikely to provoke an emotional response nor does it have an undue tendency to make the jury decide the case based on its existence alone.

After hearing testimony about Worth's gun, the trial court exercised its discretion in reversing its earlier decision regarding the bullet. It conducted an ER 403 balancing analysis on the record, and it was not unreasonable to find that the probative value of the bullet was not substantially outweighed by the danger of unfair prejudice.

39

(2)     *Map and testimony*

Worth next contends the trial court erred in permitting Detective Sloan's testimony about the cell phone location data map and further erred in admitting the map because it was hearsay.  For the reasons set forth below, we agree but do not find the error warrants reversal.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.  ER 801(c).  A statement is an oral or written assertion.  ER 801(a).  "Whether a statement is hearsay depends upon the purpose for which the statement is offered."  *State v. Crowder*, 103 Wn. App. 20, 26, 11 P.3d 828 (2000).  We review a trial court's ruling on whether a statement is hearsay de novo.  *Gonzalez-Gonzalez*, 193 Wn. App. at 688-89.

Here, the challenged evidence consists of the map created by Detective Sloan and his related testimony.  Worth argues the map depended on the accuracy of Verizon's information and the computer program's mapping functions and that Detective Sloan had no personal knowledge of any of the information used in the map's creation.  Worth argues that without evidence proving the underlying data's accuracy, the map and Detective Sloan's testimony improperly represented, as accurate information, that which was simply hearsay.

On appeal, the State argues the testimony and map fall into the business records exception, ER 803(a)(6). This rule cross-references RCW 5.45.020, which provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify admission.

The trial court did not rely on the business records exception in admitting the map and Detective Sloan's testimony. Although we are permitted to affirm on any correct alternative ground, *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012), we disagree with the State that this exception applies.

First, a business record is admissible through the business's custodian. Detective Sloan is not a custodian of Verizon's business records nor is it clear he has the expertise to describe how the record is generated to allow him to be cross-examined on its accuracy and reliability.

Second, the map is not Verizon's business record nor is it the police department's business record. The map was made by Detective Sloan specifically in anticipation of Worth's criminal prosecution. For these reasons and perhaps others unstated, we conclude that the map and related testimony were hearsay and the trial court erred in admitting them.

However, evidentiary error is not structural error and Worth must prove prejudice. *Gonzalez-Gonzalez*, 193 Wn. App. at 689. Evidentiary errors that do not implicate constitutional rights warrant reversal only if, "within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

The purpose of admitting the map was to show where Worth was on the day of the shooting. However, other evidence introduced at trial showed Worth's whereabouts. Two witnesses said Worth was looking for Gebbers at the Chelan Fresh meeting before the shooting, and Gebbers was "100 percent" sure Worth was the shooter. Worth even admitted to an officer that he was in the area around the time of the shooting. Worth has not shown how there is a reasonable probability that the outcome of the trial would have been materially different if the map and testimony were excluded. We conclude that the evidentiary error in the introduction of the map and testimony was harmless.

### B.    *Instructional error*

Worth next contends the trial court erred in instructing the jury on expert testimony when the State failed to qualify Detective Sloan as an expert witness. He argues the erroneous instruction violated the court's order in limine. We disagree.

42

Courts should not give instructions that are unsupported by the evidence at trial.

*State v. Arthur*, 42 Wn. App. 120, 122-23, 708 P.2d 1230 (1985). Expert testimony is

governed by ER 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Here, Detective Sloan testified extensively about his training and experience in

analyzing cellular telephone tracking data. His training included 120 hours of specialized

training from the U.S. Marshal's Service, the FBI, and the National Association of

Technical Investigators. He testified that interpretation of this data is generally accepted

in this field, as it is offered by these entities. This training was the foundational requisite

behind his testimony approximating where Worth was at various times during the day of

the shooting, including his opinion that one cell tower sometimes creates inaccuracies in

the data points. Because the evidence supported the expert witness instruction, the trial

court did not err in giving it.

Worth notes that the trial court granted his (uncontested) motion in limine

prohibiting the State from calling any person, including police officers, as experts. He

argues that the giving of the expert witness instruction was inconsistent with the order in

limine. We disagree. An order in limine limits evidence, not an instruction supported by

the evidence.  Worth did not object to Detective Sloan's testimony.  He waived any error

predicated on the order.  RAP 2.5(a).

           C.     *Fair trial*

As noted previously, errors in admitting evidence violate a defendant's

constitutional right to a fair trial when their admission is so unfair as to violate

fundamental concepts of justice.  *Dowling*, 493 U.S. at 352.  We consider the impact of

the erroneous evidentiary rulings and improper instructions on the case as a whole, and

we grant a new trial only when there is a risk of prejudice and no way to know what value

the jury placed on the improperly admitted evidence and instructions.  *Salas v. Hi-Tech*

*Erectors*, 168 Wn.2d 664, 673, 230 P.3d 583 (2010).

Here, the trial court erred by allowing Detective Sloan to be viewed as an expert

and to testify about where Worth was throughout the day of shooting.  But Worth

generally admitted to officers that he was at the locations where Detective Sloan said he

was.  The State's failure was not calling a Verizon records custodian and a person who

could explain the technology behind how the map was generated.  If Worth denied being

anywhere the map placed him at the times indicated, his constitutional fair trial argument

would be stronger.  But he never disputed his general locations around the general time

frame below and does not do so on appeal. We conclude that the errors, described in this section, were not so extreme so as to deprive Worth of fundamental concepts of justice.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

Worth raises numerous arguments in his statement of additional grounds for review (SAG). We address each issue in turn.

*SAG 1: Misstatement of reasonable doubt standard*

Worth first contends that the trial court erred during voir dire when it instructed the jury on the reasonable doubt standard. He argues this entitles him to a new trial. For the reasons set forth below, we disagree.

A jury must be properly instructed on the reasonable doubt standard and, when an instruction is constitutionally deficient, those defects can never be harmless. *Sullivan*, 508 U.S. at 280-82.

Here, Worth takes issue with the following discussion the trial judge had with the venire:

> The State of Washington has the burden of proving each element of the crime beyond a reasonable doubt. A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all the evidence or lack of evidence. If after such consideration you have an abiding belief in the truth of the charge you are satisfied beyond a reasonable doubt.

As about a third of you did raise your paddle being here I'd like to explain the difference between a civil case and a criminal case. In a civil case the plaintiff must prove his or her case by a preponderance of the evidence, that is, by the greater weight of evidence or more likely than not. (Inaudible) a scale—a slight tipping of the scale. Sometimes people ask, "Well, can you put—a percentage." 50.1, 49.9.

In a criminal case the plaintiff must prove every element of the crime charged beyond a reasonable doubt. (Inaudible) having a tipping of the scale, substantial tipping of the scales.

In a civil case the verdict need not be unanimous. In a criminal case the law requires that all jurors agree.

RP at 181-82.

Worth argues this definition of reasonable doubt relieved the State of its burden because it is unclear what a "substantial tipping of the scales" is. He argues that courts never attempt to define what it means when the State has proved its case beyond a reasonable doubt, and the court should have instructed the jury to disregard the definition provided during voir dire because without such an instruction, the jury was permitted to base its decision on a slightly elevated preponderance standard. We disagree.

Unfortunately, Worth failed to object to the alleged improper instruction during voir dire. Thus, he must once again meet the manifest constitutional error standard by showing the error was so obvious on the record as to warrant appellate review and he suffered actual prejudice.

We disagree that there was any improper instruction, let alone an obvious error. The trial court's comments during voir dire explained the difference between civil and criminal cases in terms of the burden of proof, and did not—contrary to Worth's argument—attempt to define what it means when the State has proved its burden. It simply said there would have to be a substantial tipping of the scales in this criminal case versus a 50.1 to 49.9 tipping in a civil case.

Even if we were to agree that the trial court's statements during voir dire were a misstatement of the reasonable doubt standard and thus an obvious error, Worth has not proved actual prejudice. Division Two of this court addressed a similar argument in *State v. Kalebaugh*, 179 Wn. App. 414, 423, 318 P.3d 288 (2014), *aff'd*, 183 Wn.2d 578, 355 P.3d 253 (2015), holding:

> [H]ere the trial court made an error in articulating the reasonable doubt standard in a preliminary oral instruction, but it properly instructed the jury, orally and in writing, at the critical time—after the presentation of evidence. It is not reasonably possible that the trial court's preliminary instruction misled the jury considering that the trial court properly instructed the jury on reasonable doubt in its final oral and written instructions, which the jury used during deliberations.

Here, like in *Kalebaugh*, the jury was properly instructed both orally and in writing on the reasonable doubt standard and the presumption of innocence before it rendered a

verdict. Yet unlike in *Kalebaugh*, here the trial court did not make an error in articulating

the reasonable doubt standard. Worth's claim fails.

*SAG 2: Judicial comments*

Worth contends the trial court improperly charged the jury on crucial matters of

fact requiring reversal of his convictions. We disagree.

Worth first argues that Gebbers gave two separate stories of the incident: first, that

Gebbers could not see who was following him and he slammed the brakes when the car

went to pass him and, second, that the car pulled up alongside him, the driver leaned over,

held a gun, and gave Gebbers an opportunity to see him before slamming on the brakes.

Worth argues that the judge "effectively said the second story was the true story" by

"corroborating Cass Gebbers' story and supporting his testimony, causing a bias with the

jury." SAG at 7. He takes issue with the following exchange, which occurred on redirect

examination:

> [THE STATE:] . . . [Is] there anything you did—that prevented you from getting shot.
> [THE DEFENSE]: Objection. Beyond the scope of cross examination.
> THE COURT: It is. Questions weren't asked about—other than—slammed the brakes, turned around, board meeting and at the hospital picking glass out.
> [THE STATE]: —think it would be within the scope . . . . She asked . . . did he receive a gunshot. So I think it's fair to ask what he did to stop that from happening.

48

> THE COURT:  He testified that he slammed the brakes.
> "When he was beside me."
> [THE STATE]:  Thank you, your Honor.
> THE COURT:  He's already testified to that.
> [THE STATE]:  I withdraw the question.  Thank you.

RP at 468-69.

Article IV, section 16 of the Washington Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."  And, "A court may not instruct the jury that 'matters of fact have been established as a matter of law.'"  *Hartzell*, 156 Wn. App. at 938 (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).  A judge impermissibly comments on a witness's testimony when the jury could infer from the comments that the judge personally believed or disbelieved the testimony in question.  *Lake Hills Invs. LLC v. Rushforth Constr. Co.*, 14 Wn. App. 2d 617, 642, 472 P.3d 337 (2020), *rev'd*, 494 P.3d 410 (2021).  Further, "[a]ny remark 'that has the potential effect of suggesting the jury need not consider an element of an offense' could qualify as a judicial comment."  *Hartzell*, 156 Wn. App. at 936-37 (quoting *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006)).

Worth did not object to the trial court's comment during Gebbers's testimony.  We review his claim because it could be one of manifest constitutional importance, *Levy*, 156 Wn.2d at 719-20, but we disagree with Worth that the challenged exchange amounted to a

judicial comment on the evidence.  The trial judge did not improperly charge the jury on

the facts; he simply repeated what was said a few moments earlier.  A reasonable juror

would not have inferred this as an affirmation of the truth of Gebbers's testimony or as

expressing any personal belief of the judge.  Even if this could have somehow been

construed as the judge picking which story was most credible, the jury was instructed to

disregard any such comment.[7]  We presume the jury followed the court's instructions

absent evidence to the contrary.  *Spivey v. City of Bellevue*, 187 Wn.2d 716, 737, 389 P.3d

504 (2017).

Worth next argues the trial judge inappropriately interrupted defense counsel

during Wade Gebbers's cross-examination, which effectively ended Worth's questioning.

The challenged exchange is as follows:

> [THE DEFENSE:]  Okay.  So, how far off the highway were you
> when you were first taking your father's call.
> [WADE GEBBERS:]  It's roughly two to three miles.
> [THE DEFENSE:]  Two,—three miles.
> [WADE GEBBERS:]  I've never measured.

---

[7] The first jury instruction read, in part:

> Our state constitution prohibits a trial judge from making a comment
> on the evidence.  It would be improper for me to express, by words or
> conduct, my personal opinion about the value of testimony or other
> evidence.  I have not intentionally done this.  *If it appeared to you that I
> have indicated my personal opinion in any way, either during trial or in
> giving these instructions, you must disregard this entirely*.

CP at 71 (emphasis added).

50

[THE DEFENSE:]  I'm sorry?
[WADE GEBBERS:]  It's roughly two to three miles.
[THE DEFENSE:]  Okay.  Did you say something else—after that?
[WADE GEBBERS:]  I just—
THE COURT:  He said he's never measured.
[THE DEFENSE:]  Oh.  Okay.  Thank you.
I don't have anything else.  Thank you.

RP at 476-77.

This exchange does not demonstrate a judicial comment on the evidence.  From the record, it seems the defense counsel misheard the witness and asked the question again to clarify.  The judge simply told the defense what the witness said a few seconds prior.  No other comments about the veracity or credibility of Wade's testimony were made.  The cases cited by Worth—*State v. Lampshire*, 74 Wn.2d 888, 892-93, 447 P.2d 727 (1968), and *State v. Wroth*, 15 Wash. 621, 47 P. 106 (1896), *overruled by State v. Caliguri*, 99 Wn.2d 501, 664 P.2d 466 (1983)—are inapplicable because the judge made no comment on the evidence nor did the judge give reasons for making any particular ruling.  There was no damage done here, and we see no basis to reverse on these grounds.

*SAG 3:  Prior bad acts*

Worth contends the trial court erred in allowing unsubstantiated and irrelevant allegations of Worth's prior bad acts toward Gebbers.  We disagree.

51

Under ER 404(b), evidence of prior bad acts is presumptively inadmissible. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Evidence of prior bad acts may, however, be admissible if offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. ER 404(b).

We review a trial court's evidentiary rulings for abuse of discretion. *Peralta v. State*, 187 Wn.2d 888, 894, 389 P.3d 596 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Salgado-Mendoza*, 189 Wn.2d at 427.

Here, Worth filed a motion in limine to exclude prior bad acts alleged by Gebbers and his family. The defense noted there were no witnesses to those alleged acts and the State responded that it did not plan to call witnesses for that reason. The State explained it would elicit testimony that Worth had followed Gebbers on numerous other occasions to provide context for why Gebbers was so surprised when Worth passed him on the day of the shooting.

Worth takes issue with the following ruling:

> THE COURT: . . . I don't know if just following somebody constitutes—Well, it's certainly not a crime, not a wrong. It may be an action, as such. It certainly doesn't seem to fit under [ER] 404(b) at this point—you know, with any testimony.
> So basically I'm going to grant the motion here, but for possibility that Mr. Gebbers may indicate[ ] he had been followed, as such. And—I

also seem to hear that he might say this is the first time . . . Mr. Worth tried
to go around his (inaudible)—how that—plays out. We'll deal with that—
at the time—maybe—stated.

But for now the court's going to grant—defense request.

RP at 154-55.

Gebbers testified that Worth had followed him on several occasions. The

prosecutor emphasized this behavior in opening and closing arguments, explaining how

Gebbers was used to being followed but was not used to Worth passing him. Worth

argues the State used these "prior bad acts" to establish conformity and propensity to

commit the alleged crime rather than to establish motive, intent, or any other permissible

reason.

This argument lacks merit. As the trial court noted, in all of the instances

described by Gebbers, Worth did not commit any crime. Thus, those instances cannot

prove propensity for criminality. The trial court accepted the State's proffered reason for

the testimony—which was to show why Gebbers was so surprised when Worth passed

him before the shooting—and that the evidentiary ruling was not manifestly unreasonable.

*SAG 4: Ineffective assistance of counsel: prior bad acts*

Worth contends his counsel was ineffective for failing to object to the admission of

the prior bad acts discussed above and failing to propose a limiting instruction on that

evidence. He argues his trial counsel failed to research and understand the relevant

evidentiary rules and related case law and that there was no strategic or tactical decision

not to object. Again, we disagree.

A criminal's right to effective assistance of counsel is constitutionally protected.

U.S. CONST., amend. VI; WASH. CONST. art. I, § 22. We review ineffective assistance of

counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To prevail, a defendant must show both (1) that defense counsel's performance was

deficient and (2) that the deficiency resulted in prejudice. *State v. Grier*, 171 Wn.2d 17,

32-33, 246 P.3d 1260 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104

S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Performance is deficient when it falls "below an

objective standard of reasonableness based on consideration of all the circumstances."

*McFarland*, 127 Wn.2d at 334-35. "Reasonable conduct for an attorney includes carrying

out the duty to research the relevant law." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d

177 (2009). To meet the prejudice prong, a defendant must prove that, but for counsel's

deficient performance, there is a reasonable probability that the outcome of the

proceedings would have differed. *Id.*

Worth's counsel filed a motion to exclude Worth's alleged prior bad acts toward

Gebbers. During argument, Worth's counsel agreed that Gebbers could not be prevented

from testifying to his experiences. The court found that the allegations did not fall into

54

ER 404(b) and, as explained above, this ruling was not an abuse of discretion. Counsel's

decision not to continue arguing this point did not fall below an objective standard of

reasonableness and thus was not deficient performance. We need not analyze prejudice

when deficiency has not been established. *See In re Pers. Restraint of Crace*, 174 Wn.2d

835, 847, 280 P.3d 1102 (2012).

     *SAG 5: Evidentiary errors: map and bullet*

     Worth supplements his appellate attorney's argument regarding the admission of

Detective Sloan's testimony and cell phone location map. He argues the detective used

his judgment to put the "push pins on a map" where calls were made, which is

"completely unaccepted in the scientific, and law enforcement communities." SAG at 17.

He contends Detective Sloan took other accounts and phone numbers and confused them

for Worth's when creating the map of Worth's location. He does not provide any

evidence, citations to the record, or argument for these assertions, and we decline to

review them. *See* RAP 10.10(c) (We will not consider an argument made in a statement

of additional grounds if it does not inform us of the nature and occurrence of the alleged

error.).

     Worth also supplements his appellate attorney's argument regarding the admission

of the bullet in his car. Citing *United States v. Warledo*, 557 F.2d 721 (10th Cir. 1977),

he argues the admission of the bullet without connection to the crime is reversible error.

In *Warledo*, the defendants were charged with conspiring to set fire to a railroad bridge, attempting and conspiring to obstruct interstate commerce, and possessing an incendiary bomb. *Id.* at 723. The government introduced evidence of a defendant's AR-15 rifle to impeach his testimony on cross-examination that he did not possess an automatic weapon. *Id.* at 724. The Tenth Circuit held, "Mainly because the rifle was unrelated to any issue in the case and due also to the fact that it was inherently prejudicial, we are of the opinion that the court erred in receiving it." *Id.* None of the defendants were alleged to have carried such a firearm during the commission of the crimes, and the government impermissibly injected a prejudicial, collateral issue. *Id.* at 725-26. The prejudice resulting from the evidence tainted all of the defendants in the eyes of the jury. *Id.* at 726.

Not only is *Warledo* not binding on this court, *see W.G. Clark Construction Co. v. Pacific Northwest Regional Council of Carpenters*, 180 Wn.2d 54, 62, 322 P.3d 1207 (2014), it is not helpful to Worth's case. There, the charged crimes did not involve automatic weapons *at all* and the AR-15 rifle was an entirely collateral matter used to impeach a defendant's testimony. Here, Worth was charged with drive-by shooting and attempted murder with a firearm and bullet fragments were recovered from the scene. The crime laboratory was unable to match the fragments to the bullet, but it did not

conclusively determine that the fragments were *not* from a similar bullet. The admission

of the bullet was not error, let alone a reversible error.

   *SAG 6: Ineffective assistance of counsel: evidentiary errors*

   Worth contends he received ineffective assistance when his counsel did not retain

an expert for the cell phone data or obtain a copy of his cell phone records. He alleges he

repeatedly asked his counsel to obtain the records, which would show that he was in

Wenatchee and not Brewster when the incident occurred.[8]

   We outlined the basic standards for ineffective assistance of counsel claims above.

Additionally, "To provide constitutionally adequate assistance, 'counsel must, at a

minimum, *conduct a reasonable investigation* enabling [counsel] to make informed

decisions about how to best represent [the] client.'" *In re Pers. Restraint of Fleming*, 142

Wn.2d 853, 866, 16 P.3d 610 (2001) (alterations in original) (quoting *Sanders v. Ratelle*,

21 F.3d 1446, 1456 (9th Cir. 1994)). "The Sixth Amendment right to effective assistance

of counsel includes expert assistance necessary to an adequate defense." *State v.*

*Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006).

---

   [8] Within this argument Worth alleges another person (Kaileb Eikerman) was in
Brewster, but does not elaborate on why data from Mr. Eikerman's cell phone would have
been included in Detective Sloan's map. Without citations to the record or legal
argument, we cannot review this claim. RAP 10.10(c).

Worth raised this issue at his review hearing before sentencing. However, this ineffective assistance argument largely rests on matters outside the appellate record, i.e., conversations Worth alleges he had with his trial counsel. "'If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition . . . .'" *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018) (quoting *McFarland*, 127 Wn.2d at 335)). We therefore refrain from deciding this issue on direct review.

*SAG 7: Right to bear arms*

Worth contends his constitutional right to bear arms was violated at trial when the prosecutor repeatedly mentioned his concealed pistol permit "as an inference of guilt." SAG at 21. We disagree.

Both the state and federal constitutions protect an individual's rights to bear arms, although our state provision is facially broader. *State v. Rupe*, 101 Wn.2d 664, 706, 683 P.2d 571 (1984); U.S. CONST. amend. II; WASH. CONST. art. I, § 24. To protect the integrity of constitutional rights, we consider two related propositions: "The State can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." *Rupe*, 101 Wn.2d at 705.

58

Worth takes issue with comments made by the prosecutor in opening and closing. In opening, the prosecutor stated: "[Detective Rob Heyen will] tell you about the search warrant he did . . . on Mr. Worth's car, found his concealed weapons permit—pistol permit, actually.  (Inaudible) find the gun."  RP at 374.  The prosecutor made no other comments about the permit until closing, when he brought up Worth's claim that his gun was stolen, that they found the concealed pistol permit, and "then all of a sudden when this all went down, that gun's missing," yet Worth did not report it stolen.  RP at 704.

We disagree with Worth that these comments "chill" the assertion of his constitutional right to bear arms.  Rather, the State argued that Worth's story about his gun being stolen right before the incident was suspicious.  The permit was brought up to show that Worth was legally permitted to carry the gun matching the bullet recovered in his car, yet he decided not to file a report after its alleged theft.  The inferences drawn were not based on Worth's assertion of his right to bear arms, but on his decision not to file a report after his legally obtained and permitted weapon was stolen.

Thus, while the State mentioned Worth's permit, its arguments did not infringe on Worth's rights.  The weapon and permit themselves were not used to justify criminal punishment, and the State was not prohibited from mentioning them in opening and closing arguments.  *See Hoffman*, 116 Wn.2d at 92 ("Although constitutionally protected

59

behavior alone cannot justify criminal punishment, the corollary to that proposition is that if evidence has probative value, its use is not prohibited simply because constitutional provisions may also be implicated."). The State is entitled to present its best case given the evidence. And, we note that Worth's counsel zealously argued that there was no evidence linking Worth's weapon or permit to the crime.

In sum, we disagree with Worth that his constitutional right to bear arms was violated by the admission and argument regarding his concealed carry permit and any reference to that evidence did not incite the jury or punish Worth for exercising such a right.

*SAG 8: Ineffective assistance of counsel: right to bear arms*

Worth contends his counsel was ineffective for failing to object to the State's arguments regarding his concealed pistol permit when there was no evidentiary connection between his permit, the bullet recovered from his car, and the crimes. We disagree.

To prevail on an ineffective assistance of counsel claim for failure to object, a defendant must show that if counsel had objected on the grounds proposed, the objections would likely have been sustained. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007). As we have discussed above, we presume counsel's performance was adequate

60

and effective. *McFarland*, 127 Wn.2d at 335. "Lawyers do not commonly object during closing argument 'absent egregious misstatements.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993)). We generally assume that counsel's decision not to object during closing falls within a wide range of permissible legal conduct. *Id.*

Worth is unable to prove that his counsel was ineffective for not objecting to the mention of his concealed pistol permit and bullet during opening and closing arguments. Given the standard, he would have to prove that the prosecutor's comments were highly improper and prejudicial (which he does not effectively argue) and that if counsel had objected, those objections would have been sustained. He has not made those arguments, and the record does not support such an argument even if he had. Worth's counsel was not ineffective for failing to object in an alleged effort to protect Worth's constitutional right to bear arms.

*SAG 9: Medical records*

Worth contends the trial court erred in admitting photographs of Gebbers at the hospital where he was treated for superficial injuries. He argues that medical records may sometimes be admitted under the business records exception, but that the trial court erred in admitting them without an adequate foundation. We disagree.

61

The State introduced five photographs taken from when Gebbers arrived at the hospital after the shooting. During Gebbers's testimony, the State handed him the photographs and asked him to describe them. He told the jury that exhibit 3 shows blood on his shirt from his arm and when the State asked when he sustained that injury, he replied: "When I got shot at." RP at 460. Gebbers described exhibit 4 as showing his arm with a bandage on it. Exhibit 4 also showed "little speckles . . . where the glass was at, all the way down" his arm. RP at 460. Exhibit 5 showed Gebbers sitting with his arm bandaged and "you can see—fragments of glass." RP at 461. Exhibit 6 showed his arm again, and exhibit 7 showed a "cut" and glass fragments. RP at 462. Gebbers testified that at the hospital, they picked the glass out of his arm with tweezers. When the State asked whether Gebbers was injured anywhere else but his arm, he said "[n]o." RP at 464.

The requirement to authenticate documentary evidence is satisfied if there is sufficient evidence to support a finding that the matter in question is what its proponent claims. ER 901(a). Under ER 901(b)(1), the authentication requirement may be satisfied by testimony from personal knowledge. *State v. Kinard*, 109 Wn. App. 428, 436, 36 P.3d 573 (2001). Here, the State admitted photographs of Gebbers's injuries through Gebbers. Gebbers's own testimony that they were pictures of him in the hospital accurately showing his injuries was sufficient for the photographs to be admitted.

62

*SAG 10:  Cumulative error*

Worth contends that the cumulative effect of the above trial errors warrant reversal even if each error standing alone would not.

"Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless."  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  A defendant is entitled to a new trial only when the cumulative errors resulted in a trial that is fundamentally unfair.  *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).

We identified two instructional errors: the erroneous expert instruction and the omission of the accompanying firearm enhancement instruction.  We also identified one evidentiary error: the admission of the cell phone location map and related testimony. However, as discussed above, we found each of these errors to be harmless.  The expert instruction would have been proper had the State listed Detective Sloan as such.  The effect of the incomplete firearm enhancement instructions was mitigated by the jury's drive-by shooting verdict and the general instructions on reasonable doubt and unanimity. And the testimony of Gebbers and Detective Arnold placed Worth at the scene of the crime, independently supporting what the challenged hearsay map showed.  Cumulative error tends to apply when there are numerous trial errors which, when combined, likely

affected the outcome. The instructional and evidentiary errors here did not result in a fundamentally unfair trial, and—given the evidence presented at trial—their combined effect likely did not impact the jury's verdict.

*SAG 11: Insufficient evidence*

Worth contends the State brought insufficient evidence of the crimes and argues his convictions must be dismissed. We disagree.

As discussed above, when reviewing sufficiency challenges we ask whether, after viewing the evidence in the light most favorable to the State, any rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). We accept the truth of the State's evidence and all reasonable inferences drawn therefrom. *Id.*

Worth takes issue with what he considers inconsistencies in Gebbers's testimony and story. In support of his position, he quotes lengthy portions of the record where Gebbers first says he could not see who was following him and later says he identified Worth during the second "pass." He points out that in Gebbers's second story, he describes Worth leaning out of his passenger side window, which "any reasonable person would know . . . is physically impossible." SAG at 26. He argues the story about the two

64

men who drove up immediately after the shooting was unsubstantiated and should have created a reasonable doubt.

"A jury is free to believe or disbelieve a witness, since credibility determinations are solely for the trier of fact." *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). Credibility determinations are not subject to review on appeal, and we defer to the jury on issues of conflicting testimony, credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Worth also argues that his cell phone data map shows he was not in Brewster but was in Wenatchee at the time of the shooting. Although it is beyond the province of this court to weigh the evidence, State's exhibit 86 shows Worth was in Wenatchee after the incident and *not* before. Conversely, the map shows Worth was in Brewster both before and after the shooting. Any rational jury would have seen this evidence and inferred that Worth was indeed at the scene around when the crime occurred and was not, as Worth alleges, in Wenatchee.

In conclusion, Worth's arguments in this SAG almost all involve perceived conflicts in testimony and the persuasiveness of the evidence. These are not issues this court addresses on appeal. The evidence, viewed in the light most favorable to the State, supported the convictions of drive-by shooting and attempted murder. That is, any

rational jury would have been able to conclude that the State proved those crimes beyond a reasonable doubt.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____     _____
Siddoway, A.C.J.                     Staab, J.

66